# IN THE SUPREME COURT OF IOWA

No. 11–0305

Filed September 2, 2011

**IN THE INTEREST OF H.S. and S.N.,**
  Minor Children,

**V.R.,** Mother,
  Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Constance Cohen, Associate Juvenile Judge.

A father seeks further review after the court of appeals reversed a juvenile court order terminating the mother's parental rights. **DECISION OF THE COURT OF APPEALS VACATED AND JUDGMENT OF THE JUVENILE COURT AFFIRMED AS TO H.S.; DECISION OF THE COURT OF APPEALS AFFIRMED AS TO S.N.**

Katherine A. Daman of The Powell Law Firm, P.C., Norwalk, for appellant mother.

Michael J. Bandstra of Bandstra Law Office, Des Moines, for appellee father of H.S.

William E. Sales III of Sales Law Firm, P.C., Des Moines, for appellee father of S.N.

Thomas J. Miller, Attorney General, Bruce Kempkes, Assistant Attorney General, John P. Sarcone, County Attorney, and Stephanie Brown and Andrea Vitzthum, Assistant County Attorneys, for appellee State.

John P. Jellineck, Des Moines, attorney and guardian ad litem for minor children.

**MANSFIELD, Justice**.

We granted further review in this case to address the extent to which the elimination of the potential availability of child support is relevant in an Iowa Code section 232.116 (2009) termination of parental rights proceeding. We conclude the elimination of possible child support should not affect termination if it is otherwise in the child's best interests as defined by section 232.116(2).

In this case, the juvenile court terminated the noncustodial mother's parental rights to two children under section 232.116, but the court of appeals reversed after giving weight to the fact that termination would end the mother's child support payments. On our review, we disagree with the court of appeals and find the juvenile court's analysis of the facts and the law persuasive. Therefore, we vacate the opinion of the court of appeals and affirm the judgment of the juvenile court as to the child whose father filed a timely application for further review.

## I. Background Facts and Proceedings.

Valarie is the mother to two daughters, S.N. (born November 2003) and H.S. (born May 2007). Steven is the biological father of S.N., and Charles is the biological father of H.S. Before October 2009, Valarie served as the primary custodian and caregiver to the two children, while Charles and Steven exercised visitation through informal agreements.

During a visit in late October 2009, Charles discovered several red marks and bruises to H.S.'s buttocks, lower back, and upper legs while changing her diaper. Charles immediately contacted the police and took H.S. to the hospital. Charles testified that H.S. told him at the hospital that Valarie's husband, Tony, caused the injuries by spanking H.S. for wetting herself. The records reflect that H.S. told both the treating emergency room physician and police investigators that "Tony did it."

The abuse was reported to the Iowa Department of Human Services (DHS), which initiated a child protective assessment. During the assessment, Valarie denied causing the injuries or having any knowledge as to their origin. Valarie also expressed certainty that Tony was not responsible and instead suggested that Tony's thirteen-year-old daughter might have caused H.S.'s injuries. DHS subsequently determined the physical abuse report was founded, identifying Tony as the perpetrator.

On November 3, 2009, the juvenile court entered a temporary removal order placing H.S. in Charles' custody and S.N. in Steven's custody. The next day, the State filed a petition seeking to have H.S. and S.N. adjudicated children in need of assistance (CINA) under Iowa Code sections 232.2(6)(*b*) and .2(6)(*c*)(2). Removal was confirmed by stipulation of the parties at an uncontested hearing on November 10. The children remained in the custody of their fathers, and services were initiated including family team meetings, family safety risk and permanency services, and supervised visitation. Valarie also attended therapy and parenting classes.

Contested CINA adjudication hearings were held on December 16, 2009, and January 29, 2010. At the first hearing, Valarie remained adamant that Tony had not caused H.S.'s injuries. However, by January 29, Valarie had changed her position and accepted that Tony had physically abused H.S. Accordingly, Valarie stipulated to the children being adjudicated CINA and further testified that she planned to divorce Tony and move into a separate residence.

Valarie moved into a new residence in February 2010 and filed for a divorce from Tony. However, at disposition proceedings held in March and May 2010, Charles testified that he continued to see Valarie and

Tony together in the community. He presented photographs showing Tony's car parked outside of Valarie's new home. Valarie disputed Charles' testimony; she testified that she had no further contact with Tony after January 29 and that her sister had been the one using Tony's car. Based on continued concerns over Tony's possible presence, the children remained in the custody of their fathers, and Valarie's visits remained supervised.

In May, Valarie, Charles, and Steven stipulated to a case permanency plan and agreed to pursue a shared parenting plan in district court. Accordingly, the juvenile court authorized concurrent jurisdiction to allow for the litigation of custody and visitation. *See* Iowa Code § 232.3(2). Valarie also signed a release and satisfaction of Child Support Recovery and agreed to pay $100 per month to Charles and $50 per month to Steven.

In June 2010, the parties agreed to a visitation schedule for Valarie which included unsupervised weekend and overnight visits. However, following H.S.'s first overnight stay, it was revealed that Valarie had taken H.S. to visit Tony's mother.[1] At this time, DHS made it clear that only persons preapproved by DHS were allowed around the children. Despite these concerns, the unsupervised and overnight visits continued, and by August, the parties were actively working to craft a shared custody plan that could be presented to the district court.

Implementation of a long-term custodial arrangement stalled in August when it was suggested at a family team meeting that Valarie might be pregnant. Valarie vigorously denied the allegation, but several weeks later she informed DHS that she was in fact pregnant and that

---

[1] Tony was in prison during this time.

Tony was one of two possible fathers.[2]  Based upon the expected delivery date, Valarie admitted that conception likely took place in early March, even though she had previously testified she had had no contact with Tony since January 29.  Valarie and Tony's divorce was finalized on August 27.

Following a contested permanency hearing on September 15, the juvenile court entered an order transferring sole legal custody of H.S. and S.N. to Charles and Steven, respectively.  *See id.* § 232.104(2)(*d*)(2).  However, the juvenile court initially found compelling reasons not to terminate the parental rights of Valarie due to the children's placement with a parent and ongoing financial support from Valarie.

Charles and Steven disagreed with the permanency order and subsequently filed petitions to terminate Valarie's parental rights invoking chapter 232.[3]  Charles filed his petition on September 17, while Steven filed his on October 15.  Shortly after Charles filed, Valarie

---

[2]The other possible father was a man whom Valarie could not identify by name. Valarie later told a home service provider that Tony "probably" was the father.  At the termination trial, Valarie testified that Tony's being the father was a "higher possibility."  Valarie also continued to maintain she had "no idea" she was pregnant as late as five months into the pregnancy.

[3]Under chapter 232, only "[a] child's guardian, guardian ad litem, or custodian, the department of human services, a juvenile court officer, or the county attorney may file a petition for termination of the parent-child relationship and parental rights with respect to a child."  Iowa Code § 232.111(1); *In re H.J.E.*, 359 N.W.2d 471, 474 (Iowa 1984) (stating a father is "not a party authorized to file a petition seeking termination under chapter 232").  Chapter 600A, not chapter 232, authorizes the filing of termination petitions by parents.  *See* Iowa Code § 600A.5(1)(*a*).  However, when (as here) the children have the status of CINA, any termination proceedings must be conducted pursuant to chapter 232.  *See id.* §§ 232.109, 600A.5(2); *H.J.E.*, 359 N.W.2d at 474.  According to the juvenile court, both the State and the guardian ad litem "though not originally in support of the petitions, joined in the fathers' requests to terminate the parental rights of the mother."  The record contains a written statement by the guardian ad litem in support of termination.  We do not find in the record any indication that the State actually joined in the petitions for termination, although it made several appellate filings in support of the fathers and no one disputes that it joined.  For purposes of this appeal, we will assume the State joined in the fathers' petitions for termination of Valarie's parental rights.

contacted DHS and initiated a child protective assessment against him alleging physical abuse. DHS determined the assessment was unsubstantiated. The juvenile court later found the allegations to be "without merit" and "motivated by [Valarie's] own ill-conceived agenda rather than the welfare of her children."

In early October, DHS reduced Valarie's visitation to two semi-supervised visits per week after it was discovered that Valarie had allowed an unknown individual to be present during a visit.

By the end of October, continued efforts to formulate a long-term visitation plan were abandoned when Valarie announced at a family team meeting that she had hired a private investigator who had evidence that Charles was dealing drugs out of his home. In light of the allegation, Charles sought to depose the private investigator. The juvenile court granted the request. Although the deposition transcript was entered into evidence, it was not made a part of the record. Nonetheless, the parties do not dispute that, during his deposition, the private investigator stated he was never hired by Valarie and denied investigating or having any knowledge of Charles or his activities.

A five-day trial on the petitions to terminate Valarie's parental rights was held in November and December 2010. Counsel appeared for each father, for the mother, and for the children. The county attorney's office also participated in the hearing.

Charles testified that although he never initiated a DHS referral, his concerns over Valarie's parenting had emerged early in H.S.'s life. Charles indicated that H.S. had a rash "that was worse than a blister . . . all the way around her neck" caused by Valarie's propping a bottle and allowing formula to drip down and collect in a ring around H.S.'s neck. Charles also testified that Valarie never arranged for dental care for H.S.

and that H.S. had three untreated cavities when custody was transferred to him. In addition, Charles testified that Valarie often sent dirty bottles and clothes to Charles' house, provided an inadequate car seat for transporting H.S., and gave H.S. lip gloss that was inappropriate for a young child.

Charles' wife Amanda testified that she was prepared to adopt H.S. if Valarie's parental rights were terminated. Assuming that H.S.'s safety needs were being met, both Charles and Amanda confirmed that Valarie would continue to have a role in H.S.'s life. Charles also committed to maintaining contact between H.S. and her older sister, S.N.

Steven, the father of S.N., also testified. Steven explained that he was living with a paramour and that he, his paramour, and his paramour's mother were responsible for S.N.'s care. Steven said that Charles' and Amanda's testimony was accurate as far as he was concerned, although he added, "I don't have a problem with Valarie when it comes to my kid ever . . . ." Steven testified that after DHS became involved, he and Charles got to know each other and began talking to each other about Valarie. Like Charles, Steven stated that it would be his intent to allow contact between the child and Valarie to continue even if Valarie's parental rights were terminated.

Valarie testified that she did not intend to resume her relationship with Tony. Valarie acknowledged (contrary to prior statements) that Tony had physically abused H.S. and that her earlier testimony about having had no contact with Tony after January 2010 was false. However, she downplayed her post-January contacts, claiming she had only one encounter with Tony that could have resulted in her current pregnancy. As she explained:

I had been drinking, and he had called me, wanted to know if we could meet to talk about getting the rest of his stuff out of the property. I said, Yes, that's fine . . . . And, obviously, one thing happened to another.

Valarie made clear that her goal was to obtain primary physical care of both H.S. and S.N. She added that both fathers owed child support to her from the prior time period when she was caring for both girls.

Both DHS caseworkers testified that termination was in the children's best interest. As one of them elaborated:

Well, the children are bonded to their mother and clearly they love her and she loves them and there has been some parental progress on Valarie's part. I do think, looking long term, that it's best for parental rights to be terminated in regards to Valarie and the girls just because there are so many ongoing issues that could create a lot of instability for the next several years and I don't feel that is fair. And there's no way, at this point, to ensure their safety. Valarie continues to make poor decisions about relationships despite understanding expectations . . . . I have every reason to believe that [Valarie and Tony's] relationship would probably resume or continue and there's just no way to ensure through this capacity that the girls would be safe.

At the end of trial, the attorney for the children/guardian ad litem filed a written statement supporting termination. His conclusions were that "[Valarie] will never sever her ties with [Tony]," that Tony will be back in the girls' lives upon his release from prison, and that it would not be in the girls' best interests "to ever face that possibility." Yet he also emphasized his hope that some sort of relationship could be maintained because it is obvious that Valarie and H.S. and S.N. "share a close bond."

The service providers who testified were unable to support termination, although they recognized ongoing concerns with Valarie's decisionmaking. Finally, and despite noting that Valarie "may not be able to keep her children safe when they are with her," H.S.'s therapist

also cautioned against termination, arguing that "the children's bond with Valerie [sic] is strong and the children continue to receive positive nurturing from a relationship with Valerie [sic]."

On February 11, 2011, the juvenile court entered an order terminating Valarie's parental rights to both children. The court concluded the statutory grounds for termination had been established under Iowa Code section 232.116(1)(*d*), (*f*), and (*i*) for S.N., and under section 232.116(1)(*h*) and (*i*) for H.S. In a detailed review of the facts, the court noted Valarie had lied about her continuing contact with Tony and about being pregnant (likely with him), had made false claims that she had hired a private investigator who had determined Charles was engaged in drug dealing, and generally lacked insight and honesty. The juvenile court added that Valarie "has lost trust not only with providers, but with her children. As stated in the children's therapist's report of September 30, 2010, 'Valarie has lost [H.S.'s] trust.' "

In analyzing whether termination was in the children's best interests, the juvenile court explained:

> [T]ermination of parental rights of one parent only is a severe remedy in a case where the permanency plan is for the fathers to retain custody of the children. The salient issue in this case is whether or not termination of parental rights is in the children's best interest and would be less detrimental than the harm that would be caused to them by continuing the parent/child relationships.
>
> Sadly, the Court must conclude that the evidence supports no other finding than a severance of Valarie['s] parental rights being in the children's best interest. Her conduct has indicated that she has not, cannot, and will not place her children's safety and well-being first. She is far more interested in her own agenda than what is in her children's best interest. After more than fourteen months, after making some progress, her contact with the children must be professionally supervised to ensure their safety, yet she now indicates she would seek primary physical custody in concurrent jurisdiction litigation. To continue the

parent/child relationships would expose the children to ongoing strife, litigation, and contention that would undermine their safety, well-being and permanency.

. . . .

Ultimately, if concurrent jurisdiction orders were put in place and the Juvenile Court case were to close, [Charles] and [Steven] would have the ongoing burden of monitoring family contact, and repeatedly litigating its terms until the children were eighteen. If professional supervision were required long-term, additional financial stress may fall upon the fathers. Under this scenario, the children would not have the safety and permanency they need. While it was hoped that the parties develop a visitation plan that would assure the children's ongoing safety, there simply is no such plan. Nor is there reason to believe additional time and effort to work out such a plan would be successful. While the children's bond with their mother is important, their safety is more important. Valarie simply cannot be trusted to protect them as evidenced by her prior acts and omissions.

The Court is satisfied that the children's fathers would not only maintain sibling contact, but assure Valarie has a safe role in their lives. The only way to guarantee the stability and long-term nurturing and trust building that these children need after [H.S.] was so severely injured on Valarie's watch is by way of termination of parental rights of Valarie . . . . It is only through termination that these children will have the safety and stability they need and deserve.

Accordingly, the juvenile court entered an order terminating Valarie's parental rights to S.N. and H.S. Valarie appealed, and the case was transferred to the court of appeals.

On May 11, 2011, the court of appeals filed its decision. The court of appeals agreed that the statutory grounds for termination were met, but disagreed with the juvenile court's conclusion that termination was in the best interests of the children. The court of appeals recognized the concern that Valarie might allow Tony to reenter her life and the likelihood of contentious custody proceedings in the future, but concluded these reasons do not "outweigh the compelling reasons not to

terminate[, which] include Valarie's ongoing financial support and the placement of the children in the sole custody of their fathers." The court went on:

> Termination of Valarie's rights leaves the responsibility for the children's financial needs with a single parent or the state. The children's needs would be better met by requiring the mother to pay child support than by terminating her parental rights.

Accordingly, the court of appeals reversed the juvenile court's order terminating Valarie's parental rights to H.S. and S.N.

Charles filed a timely application for further review on May 19. However, Steven did not. Instead, on June 13, Steven filed a "Notice to the Court" requesting to join in Charles' application for further review. We granted Charles' application for further review on June 16 and requested further briefing from the parties. *See* Iowa R. App. P. 6.1103(6). The State, Charles, and Valarie all submitted supplemental briefs. Along with her briefing, Valarie filed a request that procedendo be issued in S.N.'s case, arguing Steven's effort to obtain further review was untimely.

## II. Timeliness of Steven's Request for Further Review.

Before we reach the merits of this termination proceeding, we must first determine whether the mother's parental rights to both children are properly before us. Valarie opposed further review of the court of appeals decision concerning her parental rights to S.N. by filing a request for procedendo. In that filing, Valarie argued Steven's joinder was outside the deadline for applications for further review.

Under our rules, unless otherwise ordered by the court of appeals, no procedendo from a court of appeals action shall issue for "[s]eventeen days after an opinion is filed in a chapter 232 termination of parental

rights or CINA case, nor thereafter while an application for further review by the supreme court is pending." Iowa R. App. P. 6.1208(2)(*a*). Because Charles timely filed for further review, "an application" was pending before our court.

Similarly, according to the rules, no procedendo from an action of our court shall issue (unless otherwise ordered by our court) for twenty-one days after "an opinion of the supreme court is filed" or seventeen days after "an order dismissing the appeal is filed." *Id.* 6.1208(1)(*a*)–(*b*). Thus, on their face, our rules seem to contemplate one procedendo per appeal and do not appear to envision "partial" procedendos, at least unless "otherwise ordered."

Nonetheless, Valarie's request for procedendo clearly raises the timeliness of Steven's request for further review. When we take a case on further review, we have the discretion to review any issue raised on appeal regardless of whether a party expressly asserts such issue in an application for further review. *Hills Bank & Trust Co. v. Converse*, 772 N.W.2d 764, 770 (Iowa 2009). Yet in *Peppmeier v. Murphy*, 708 N.W.2d 57 (Iowa 2005), we expressly distinguished our consideration of *issues* from our ability to grant relief to *parties* who did not seek further review. In that case, the plaintiff sued an agent and his principal, the latter on the basis of respondeat superior. *Peppmeier*, 708 N.W.2d at 59. The district court granted summary judgment to both defendants. *Id.* at 61. Subsequently the court of appeals upheld summary judgment as to the agent, but reversed it as to the principal. *Id.* The principal then sought further review of the court of appeals decision, but the plaintiff did not. *Id.* After granting further review, we held that the portion of the court of appeals decision affirming summary judgment in favor of the agent had

become final—since the plaintiff had not sought further appellate review. *Id.* at 62. We explained:

> Peppmeier [the plaintiff] did not file an application for further review to challenge the court of appeals holding that the district court properly granted summary judgment in favor of [the agent]. Such failure means this holding by the court of appeals is a final adjudication that [the agent] is not liable.
>
> We are mindful of our rule that allows us to review any or all issues raised on appeal or to limit our review to just those issues brought to our attention by the application for further review. We see no problem applying the rule when we have only two parties, but here we have one plaintiff and two defendants, one of whom has been relieved of liability. Under these circumstances, we think Peppmeier should have filed an application for further review to preserve her issues as to [the agent]. We consider her failure to do so a waiver. A contrary decision would amount to blindsiding [the agent], who took no further part in the appeal process after the court of appeals decision, believing, we are convinced, that Peppmeier had indeed waived any issues as to him.

*Id.* (citation omitted). Having determined that the court of appeals decision regarding the agent "became final when [the plaintiff] did not seek further review on this issue," we then reinstated summary judgment in favor of the principal on the basis of res judicata, since the claim against the principal was based entirely on respondeat superior. *Id.* at 64–66.

We think the same reasoning applies here. Because Steven did not file a timely application for further review, the court of appeals decision "became final" as to him. *See id.* at 64. It is true that Steven tried to join Charles' application for further review several weeks after the deadline for seeking further review had passed. But this strikes us as wholly inadequate. If a party has to file his or her own application for further review to avoid a decision of the court of appeals becoming final as to him or her, as *Peppmeier* holds, it logically follows that the party has to

file a *timely* application. The timeliness requirement is jurisdictional. *Hills Bank & Trust Co.*, 772 N.W.2d at 771.

Under Iowa law, an application for further review in a termination case "shall not be granted by the supreme court unless filed within ten days following the filing of the decision of the court of appeals." Iowa Code § 602.4102(4)(*a*); *see also* Iowa R. App. P. 6.1103(1)(*a*) (stating that an application for further review in a termination case "shall be filed within 10 days following the filing of the court of appeals decision"). The legislature has enacted a single exception to this deadline, by providing that the court of appeals shall extend the time for filing of an application if it determines "that a failure to timely file an application was due to the failure of the clerk of the court of appeals to notify the prospective applicant of the filing of the decision." Iowa Code § 602.4102(5); *see also* Iowa R. App. P. 6.1003(1)(*e*). That exception does not apply here.

We decline to speculate on the reasons why Steven failed to timely seek further review and simply note a few obvious points. S.N. is several years older than H.S. and, unlike H.S., was not established to be a victim of physical abuse by Valarie's ex-husband; Steven and S.N. are part of a different family than Charles and H.S.; and the trial testimony revealed considerably less antagonism between Steven and Valarie than between Charles and Valarie.

For the foregoing reasons, we hold that the court of appeals decision reversing the termination of Valarie's parental rights as to S.N. became final, and we affirm that result. We now turn to Charles' application for further review concerning H.S.

### III. Standard of Review.

We review proceedings to terminate parental rights de novo. *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006). We give weight to the juvenile

court's factual findings, especially when considering the credibility of witnesses, but we are not bound by them. *Id.*

### IV. Parental Financial Support and the "Best Interests" Test.

Our courts have long held that all parents are legally obligated to support their children. *Anthony v. Anthony*, 204 N.W.2d 829, 833 (Iowa 1973); *Dawson v. Dawson*, 12 Iowa 512, 514 (1861) ("The duty of the parent to maintain his offspring until they attain the age of maturity is a perfect common law duty."). This support obligation continues during juvenile court proceedings, even after a child has been removed from parental custody or has been determined to be a CINA. *See* Iowa Code § 232.2(47) (defining "*[r]esidual parental rights and responsibilities*" as "those rights and responsibilities remaining with the parent after transfer of legal custody or guardianship of the person of the child[, and] include but are not limited to the right of visitation, the right to consent to adoption, and the responsibility for support"); *see also In re Karwath*, 199 N.W.2d 147, 150 (Iowa 1972) (addressing a father's residual parental rights to make medical decisions while his children are in the care and custody of the State). However, when parental rights are terminated in Iowa, a parent's support obligation ends. *See* Iowa Code § 232.2(57) (defining the "*[t]ermination of the parent-child relationship*" as "the divestment by the court of the parent's and child's privileges, duties, and powers with respect to each other").[4]

---

[4]We recognize other states allow for the continuation of support past the termination of parental rights. However, those states do so explicitly by statute or by judicial interpretations of statutory language that significantly differs from our own. *See*, *e.g.*, Ariz. Rev. Stat. Ann. § 8–539 (Westlaw through 1st Reg. Sess. and 3d Special Sess. 2011) (providing support until a final order of adoption is entered); Me. Rev. Stat. Ann. tit. 22, § 4056(5) (Westlaw through 2011 Reg. Sess. Ch. 378) (providing that if the parent has been convicted of a crime against the child, the court may order "a lump sum payment to assist in the future financial support of the child"); 10A Okla. Stat. Ann. § 1–4–906(B) (West, Westlaw through 1st Reg. Sess. 2011) (providing support until a final decree of adoption has been entered); Tex. Fam. Code Ann. § 154.001(a-1) (West,

Because the termination of parental rights in Iowa also terminates the parent's child support obligation, this raises an obvious question: Should juvenile courts consider the potential loss of child support when they apply the best interests of the child test under Iowa Code section 232.116(2)?

In two previous decisions under chapter 232, we indicated that the loss of such financial support was an insufficient reason not to terminate if termination was otherwise in the children's best interests. Thus, in *In re L.S.*, 483 N.W.2d 836, 840 (Iowa 1992), we wrote:

> Our review of the record made before the juvenile court convinces us that the grounds alleged for termination of parental rights have been proved. It is in the children's best interests to remove them from the detrimental influence of their parents and provide a custodian who is free from the assertion by the parents of their legal rights. The fact that financial support, if any, by or through the parents is cut off is an inadequate reason to alter this result.

Similarly, two years later, in *In re M.S.*, 519 N.W.2d 398 (Iowa 1994), we reiterated this point:

> In assessing the best interests of the child, we evaluate the child's long-range as well as immediate interests. . . .

---

Westlaw through 2011 Reg. Sess. Ch. 41) (providing support until the earliest of adoption, the age of eighteen or graduation, removal of disabilities of minority, or the child's death, but possibly indefinitely if the child is disabled); *Ex parte M.D.C.* 39 So.3d 1117, 1132 (Ala. 2009) ("[I]nvoluntarily terminating a parent's rights to his or her child does not, by operation of law, extinguish the parent's responsibility to pay child support for the benefit of that child as established by a prior judgment."); *Ill. Dep't of Healthcare and Family Servs. v. Warner*, 882 N.E.2d 557, 562 (Ill. 2008) (citing 750 Ill. Comp. Stat. 50/17 and holding support continues until the child is "sought to be adopted"); *Adoption of Marlene*, 822 N.E.2d 714, 718–19 (Mass. 2005) (holding the termination of the parent-child relationship does not end the concomitant duty of support); *In re Beck*, 793 N.W.2d 562, 567 (Mich. 2010) (terminating father's parental rights did not sever his child support obligation); *State v. Fritz*, 801 A.2d 679, 685 (R.I. 2002) ("[P]arental financial support continues until a child has been emancipated, adopted, reaches the age of majority, or until the obligation has been duly terminated [by a court order]."); *In re Ryan B.*, 686 S.E.2d 601, 606 (W. Va. 2009) (continuing financial support after termination of parental rights).

> We give primary consideration to the physical, mental, and emotional condition and needs of the child. The fact that potential support would be cut off by an order to terminate is an inadequate reason to alter such a decision.

*M.S.*, 519 N.W.2d at 400 (citation omitted).

Yet these decisions did not treat the subject in detail. Over time, as exemplified by the court of appeals decision in this case, courts in our state have raised questions as to how the loss of possible financial support from one or both parents should be factored into the best interests of the child test in chapter 232 termination cases.

Here, Valarie argues the payment or nonpayment of child support is "relevant evidence of [the parent's] interest in the child's well-being." To support this argument, Valarie cites *In re Goettsche*, 311 N.W.2d 104, 106 (Iowa 1981), a termination case under chapter 600A,[5] where we stated the "abnegation of court-ordered financial responsibility is relevant evidence of indifference to the child involved." Since *Goettsche*, our appellate courts have repeatedly recognized child support generally as a valid consideration in termination proceedings under chapter 600A. *See, e.g.*, *In re D.W.K.*, 365 N.W.2d 32, 34–35 (Iowa 1985) (refusing to allow a father to voluntarily terminate his parental rights in order to avoid paying child support because this "ultimately would open a hatch for a parent to escape his or her duty to support a child"); *In re T.Q.*, 519 N.W.2d 105, 107 (Iowa Ct. App. 1994) (affirming dismissal of petition filed by father because this would end the father's duty of support); *In re J.L.W.*, 496 N.W.2d 280, 282–83 (Iowa Ct. App. 1992) (upholding denial of voluntary termination sought by father who wanted to avoid paying child support); *In re K.J.K.*, 396 N.W.2d 370, 371–72 (Iowa Ct. App. 1986)

---

[5]As noted above, chapter 600A allows a parent to seek termination of either parent's rights, but its provisions do not apply to children who are involved in CINA proceedings. *See* Iowa Code §§ 232.109, 600A.5(2).

(reversing termination and noting that "[w]e fail to find any of these factors support the finding that termination is in the child's best interest, particularly when considered with the child's right to support from her father").

However, these cases arise under a different statute. We have said that chapter 232 and chapter 600A "create separate and distinct causes of action having different applicability based upon the facts of the situation." *H.J.E.*, 359 N.W.2d at 474; *see also In re B.B.M.*, 514 N.W.2d 425, 428 n.1 (Iowa 1994). Chapter 600A sets forth a different standard for termination. *Compare* Iowa Code § 600A.8 ("Grounds for termination."), *with id.* § 232.116 ("Grounds for termination."). Unlike chapter 232, chapter 600A expressly recognizes failure to pay support as a potential ground for termination. *See id.* §§ 600A.8(3)(*a*)(2)(a), 600A.8(3)(*b*), 600A.8(4).

Moreover, each chapter has its own "best interests" test. According to section 600A.1:

> The best interest of a child requires that each biological parent affirmatively assume the duties encompassed by the role of being a parent. In determining whether a parent has affirmatively assumed the duties of a parent, the court shall consider, but is not limited to consideration of, the fulfillment of financial obligations, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of the establishment and maintenance of a place of importance in the child's life.

*Id.* § 600A.1. Thus, section 600A.1 specifically refers to the parent's "fulfillment of financial obligations."

By contrast, as we recently recognized in *In re P.L.*, 778 N.W.2d 33, 37 (Iowa 2010), section 232.116 establishes its own framework for

analyzing the best interests of the child in chapter 232 termination cases. That section provides in part:

> In considering whether to terminate the rights of a parent under this section, the court shall give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child.

Iowa Code § 232.116(2). Therefore, in *P.L.* we advised as follows:

> Rather than a court using its own unstructured best-interest test, the court is required to use the best-interest framework established in section 232.116(2) when it decides what is in the best interest of the child. The primary considerations are "the child's safety," "the best placement for furthering the long-term nurturing and growth of the child," and "the physical, mental, and emotional condition and needs of the child." Accordingly, a court should base its best-interest determination on the legislative requirements contained in section 232.116(2), rather than upon the court's own value system. Additionally, in making this determination the court's decision should contain specific reasons as to why the court made its determination under section 232.116(2). By doing so, we will assure parents that our courts are applying the legislative intent of the statute in termination actions decided under chapter 232.

*P.L.*, 778 N.W.2d at 37 (quoting Iowa Code § 232.116(2)).

*P.L.* was foreshadowed by *In re K.M.*, 653 N.W.2d 602 (Iowa 2002), and by Justice Cady's special concurrence in *In re J.E.*, 723 N.W.2d 793 (Iowa 2006). As pointed out in those opinions, our general assembly amended chapter 232.116(2) in 1998. *See* 1998 Iowa Acts ch. 1190, § 23. While the section previously stated that "the court shall give primary consideration to the physical, mental, and emotional condition and needs of the child" when determining whether to terminate parental rights, Iowa Code § 232.116(2) (1997), it now reads "the court shall give primary consideration to the *child's safety, to the best placement for furthering the long-term nurturing and growth of the child,* and to the

physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2) (2009) (emphasis added). As Justice Cady's concurrence points out, the legislature "has significantly, and not too subtly, identified a child's safety and his or her need for a permanent home as the defining elements in a child's best interests." *J.E.*, 723 N.W.2d at 802 (Cady, J., specially concurring); *see also K.M.*, 653 N.W.2d at 608 (noting that the legislation "articulated the concerns that clearly impact a child's best interests: the child's safety and need for a permanent home").

Notably absent from section 232.116(2), *P.L.*, *J.E.*, and *K.M.* is any explicit reference to financial support payments, and we believe it would be inappropriate for Iowa courts to introduce such a consideration.[6] While taking child support directly into account under chapter 600A makes sense because that is a private termination statute, and thus a component of our domestic relations law, section 232.116 addresses the typically more urgent situation in which a child is at a high degree of risk. *See In re M.M.S.*, 502 N.W.2d 4, 9 (Iowa 1993) ("There is not always the urgency in chapter 600A termination cases that we have noted in

---

[6]Some states have specifically stated that the financial support of a parent may be used in determining best interests of a child. *See, e.g.*, Conn. Gen. Stat. Ann. § 45a–717(e)(1) (West, Westlaw through Gen. St., Rev. to 1-1-2011); Del. Code Ann. tit. 13, § 722(a)(6) (West, Westlaw through 78 Laws 2011, Chs. 1–72, 75, 79–92); Mo. Ann. Stat. § 211.447(7)(3) (West, Westlaw through 2011 1st Reg. Sess.). Thus, while Valarie refers us to a Missouri Court of Appeals decision in support of her position that payment of child support should be considered in this termination proceeding, *In the Interest of T.A.L.*, 328 S.W.3d 238 (Mo. Ct. App. 2010), she candidly acknowledges that Missouri law directs the court to consider "[t]he extent of payment by the parent for the cost of care and maintenance of the child when financially able to do so." *See* Mo. Ann. Stat. § 211.447(7)(3).

Also, even when a jurisdiction authorizes the financial support of the parent to be taken into account, the court may find that other factors outweigh it. *State ex rel. Juvenile Dep't of Multnomah Cnty. v. Proctor*, 10 P.3d 332, 334 (Or. Ct. App. 2000) (abusive father's parental rights should be terminated regardless of the loss of the right to financial support).

termination cases under the juvenile code (Iowa Code § 232.109 *et seq.*).”). In these circumstances, the legislature has directed us to focus on the child's safety, long-term nurturing and growth, and physical, mental, and emotional condition and needs, rather than court-ordered child support.

It is true that noncustodial child support payments generally help a child's needs to be met. Still, we cannot ignore the contrast between the wordings of the two statutes. When the legislature wanted a parent's fulfillment of financial obligations to be taken directly into account, it said so expressly in section 600A.1. In any event, when termination of parental rights occurs, other sources of financial support for the child may become available, and we do not read section 232.116(2) as directing courts to engage in a dollar-for-dollar weighing process. Rather, the child's safety and need for a permanent home are paramount concerns. *See J.E.*, 723 N.W.2d at 802 (Cady, J., specially concurring); *K.M.*, 653 N.W.2d at 608.

We also share the court of appeals' concern that, in some instances, terminating the rights of a parent who is obligated to pay child support may place a greater financial burden on the remaining parent or the State.[7] But if the alternative is that the child's safety, nurturing and growth, or physical, mental, and emotional condition and needs will suffer, the legislature has directed us to proceed with termination, provided the statutory prerequisites of section 232.116(1) have been met and nothing in section 232.116(3) would lead to a contrary result. Moreover, in many instances, if termination does not occur, the State

---

[7]Of course, in some cases termination may enable the child to be adopted by a person or persons who are willing to assume the financial obligations of parenthood. The record in this case indicates that H.S.'s stepmother Amanda was willing to adopt her.

remains under the obligation to provide services to that parent, often at a greater cost than the child support payments in question. Also, chapter 232's requirement that termination proceedings be brought by a representative of the child or the State, *see* Iowa Code § 232.111(1), reduces the risk of a termination being pursued to avoid financial obligations.

Finally, we are not holding that evidence about child support is inadmissible in a chapter 232 proceeding. Payment, or nonpayment, of such support may provide relevant information about the parent's ability to successfully parent. To this extent, we agree with Valarie's argument. What we are holding, consistent with our earlier decisions in *L.S.* and *M.S.*, is that the anticipated loss of child support funds in and of themselves as a result of termination should not be part of the section 232.116(2) best interests analysis.

Turning to the facts of this case, we agree with the findings and conclusions of the juvenile court. There is no real dispute that the statutory requirements for termination under Iowa Code section 232.116(1) were met. Both the juvenile court and the court of appeals so found, specifically noting that the children had been out of Valarie's custody for over fourteen months and could not presently be returned to her care. The disagreement centered on the best interests requirement in section 232.116(2). During the course of a five-day trial, the juvenile court had the opportunity to evaluate the credibility of the witnesses, including Valarie. We concur in the juvenile court's careful review of the facts, including its ultimate findings that Valarie "cannot be trusted" to protect H.S.'s safety, that H.S.'s safety is "more important than" her bond with her mother, that Charles has "demonstrated for well over a year" that he can meet all of H.S.'s "needs for safety, permanency, and well-

being," and that termination of Valarie's rights would be "less detrimental than the harm" that would be caused by continuing the parent/child relationship under the ongoing supervision that would be required in light of Valarie's chronically deceptive behavior. The juvenile court thoroughly, and we believe correctly, applied the statutory factors set forth in section 232.116(2). *See P.L.*, 778 N.W.2d at 40. We also note that Amanda, Charles' spouse, intends to adopt H.S. if Valarie's parental rights are terminated. According to a service provider, Amanda and H.S. have an affectionate relationship. It was uniformly agreed that Charles' home is suitable and that H.S. has been thriving there.

The court of appeals acknowledged a number of the specific facts relied upon by the juvenile court, as well as a legitimate concern that Valarie might allow Tony to reenter her life upon his release from prison, "particularly if he is the father of the child born to Valarie." Yet it found the "children's needs would be better met by requiring the mother to pay child support than by terminating parental rights." For the reasons we have discussed, we do not believe the legislature intended this potential loss of child support to be a component of the section 223.116(2) best interests test.[8]

---

[8]Under the three-step process set forth in the statute, assuming a ground for termination has been proved under section 223.116(1), and the factors under section 223.116(2) favor termination, the court should then decide whether it need not terminate the relationship for any of the reasons set forth in section 223.116(3). *P.L.*, 778 N.W.2d at 40–41. Here, however, Valarie has not argued on appeal that any of the section 223.116(3) exceptions to termination apply. Even if she had, the only arguably relevant exception is in section 232.116(3)(*c*), i.e., "There is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." Like the juvenile court, we find there is a bond between H.S. and Valarie, but that H.S.'s safety, long-term nurturing and growth, and physical, mental, and emotional needs would be better served by termination of parental rights notwithstanding that bond. *In re D.W.*, 791 N.W.2d 703, 709 (Iowa 2010) (holding that in analyzing this exception, "our consideration must center on whether the child will be disadvantaged by termination, and whether the disadvantage overcomes [the parent's] inability to provide for [the child's] developing needs").

**V. Conclusion.**

For the foregoing reasons, we affirm the juvenile court's judgment terminating Valarie's parental rights to H.S. We vacate the opinion of the court of appeals, but affirm the result reached by the court of appeals with respect to S.N.'s parental rights.

**DECISION OF THE COURT OF APPEALS VACATED AND JUDGMENT OF THE JUVENILE COURT AFFIRMED AS TO H.S.; DECISION OF THE COURT OF APPEALS AFFIRMED AS TO S.N.**