# IN THE COURT OF APPEALS OF IOWA

No. 20-0072
Filed August 19, 2020

**IN THE INTEREST OF E.G.,**
**Minor Child,**

**E.G., Father,**
    Appellant.

_____

Appeal from the Iowa District Court for Polk County, Colin J. Witt, District Associate Judge.

The father appeals the termination of his parental rights to his child. **AFFIRMED.**

Jeremy L. Merrill of Lubinus Law Firm, PLLC, Des Moines, for appellant father.

Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee State.

Karl Wolle of Juvenile Public Defender, Des Moines, attorney, and guardian ad litem for minor child.

Considered by Doyle, P.J., and Mullins and Greer, JJ.

**GREER, Judge.**

The father appeals the termination of his parental rights to his child, E.G., born in late 2017.[1]  The juvenile court terminated the father's rights under Iowa Code section 232.116(1)(h) (2019).  The father challenges the statutory ground and maintains the loss of his rights is not in the child's best interests.  Our review is de novo, and our paramount concern is the child's best interests.  *See In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006).

To terminate parental rights under section 232.116(1)(h), the court must find all of the following by clear and convincing evidence:

> (1) The child is three years of age or younger.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

The father contests only the fourth element—whether E.G. could be placed in his care at the time of the termination hearing in December 2019.  *See* Iowa Code § 232.116(1)(h)(4) (requiring clear and convincing evidence that the child cannot be returned to parental custody at the present time); *In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010) (interpreting the statutory language "at the present time" to mean "at the time of the termination hearing").  The father maintains the court should not have terminated his rights because as of the June 24, 2019 permanency hearing, the court confirmed its goal of returning E.G. to the father's care at the permanency

---

[1] The rights of the child's mother were also terminated; she does not appeal.

review hearing scheduled approximately three months later. He relies on this to show that E.G. could have been placed in his care at the time of the termination hearing.

The Iowa Department of Human Services (DHS) got involved with this family in September 2018 after learning E.G. had been left in the care of a family friend since May. The mother had not been in contact since leaving the child with the friend, while the father had visited E.G. "a handful" of times. E.G. was formally removed from his parents' care, and the family friend was given legal custody of the child with support and supervision from DHS.

From the outset, DHS had concerns the father perpetrated domestic violence against the mother during their relationship. From the start, DHS recommended the father seek a mental-health evaluation, participate in therapy, and utilize services to address domestic violence. He failed to do so. Still, his supervised visits with E.G. went well, and he seemed to be an able parent during the short periods of time he spent with the child twice each week. With this weighing in the father's favor, and with DHS having been involved in the father's life since approximately September 2018 with no reports of domestic violence since then, the juvenile court decided to delay permanency and gave the father a six-month extension. In its June 24, 2019 order, the court stated the goal was to reunify E.G. and the father and that "[p]rogress [wa]s being made toward [the] goal." The court outlined the plan:

> The child will be able to return home within six (6) months if the following specific factors, conditions and/or expected behavioral changes are made, eliminating the need for the child's removal from the home:

> Father engages with a [mental health] therapist no later than mid July and reports are provided to DHS, and Father shall be permitted to move forward in his therapy by the agency as it is imperative Father is consistent with his visits with [E.G.], and those visits shall move to unsupervised in August and overnight in September.
>
> Father is open with DHS in vetting his home and making certain only safe persons are around [E.G.], and that he assure everyone that he will be sober while parenting his child and there will be no violence around his child.

Despite the clear terms, the father did not get a mental-health evaluation or begin therapy by mid-July. Then on August 10, he was arrested for domestic violence against his girlfriend, with whom he shared a home. The father remained in jail until August 22. He pled guilty to domestic abuse assault by impeding breathing or circulation, received a deferred judgment, and was placed on probation for two years.

At the time of the scheduled permanency review hearing on September 26, the father had not completed any of the requirements provided in the court's June order. The court ordered the State to file a petition to terminate the father's rights.

At the termination hearing on December 6, the father no longer had his own home and was staying with friends. The father had yet to start the domestic-abuse program that was ordered as part of his probation. According to a letter from a mental-health therapist, the father obtained his mental-health evaluation on October 7, 2019, which recommended continued treatment. He had "continued to participate in treatment services" and would be "working to learn to identify and manage his emotions, develop healthy and effective communication skills, and coping mechanisms."

Determining this case fell into the category of too little, too late, the juvenile court concluding E.G. could not return to the father's care because the father did "not make significant enough advances in his mental wellness and to address domestic violence in light of the circumstances of this case (especially August 10, 2019). A two year old cannot be returned to a home where the risk of a domestic violence incident taking place still exists." We agree. *See In re M.M.*, 483 N.W.2d 812, 814 (Iowa 1992) ("[A] child cannot be returned to the parent under Iowa Code section 232.102 if by doing so the child would be exposed to any harm amounting to a new child in need of assistance adjudication."); *see also In re J.R.*, No. 17-0556, 2017 WL 2684405, at *3 (Iowa Ct. App. June 21, 2017) ("The threat to children posed by domestic violence in their homes may serve as the basis for terminating parental rights" (citing *In re C.C.*, 538 N.W.2d 664, 667 (Iowa Ct. App. 1995))). That the father's aggression and perpetration of violence has historically been against romantic partners rather than E.G. does not change our analysis. *See In re D.S.*, No. 19-0003, 2019 WL 1474054, at *3 (Iowa Ct. App. Apr. 3, 2019) (affirming termination of father's rights where "anger and controlling behavior" was directed at paramour rather than child, stating, "We are not convinced [the father's] domestic violence can be so easily cleaved from his parenting promise"); *In re Marriage of Brainard*, 523 N.W.2d 611, 615 (Iowa Ct. App. 1994) (embracing expert testimony "detailing the tragic long-term consequences of spousal abuse on children who witness the violence"). We recognize the father had recently started therapy at the time of the termination hearing, but this last-ditch effort—over a year into DHS's involvement with the family, nearly three months after the deadline the court gave in its extension order, and about ten days after the State

petitioned to terminate—was too late. *See In re C.B.*, 611 N.W.2d 489, 495 (Iowa 2000) (concluding the parent's efforts were "simply too late" when the parent waited until "two or three months before the termination hearing" because "[t]ime is a critical element" and "[a] parent cannot wait until the eve of termination, after the statutory timelines are expired" to make the necessary efforts). Because E.G. could not be returned to the father's care at the December 2019 termination hearing, the statutory grounds for termination under section 232.116(1)(h) are met.

The father also claims that the termination of his rights is not in E.G.'s best interests. *See* Iowa Code § 232.116(2). At the time of the termination hearing in December 2019, E.G. was twenty-four months old and had been out of his parents care since they voluntarily left him with a family friend around eighteen months earlier. The limitation period set by the legislature has long since passed, *see id.* § 232.116(1)(h)(3), and it is in E.G.'s best interests to view the termination proceedings with urgency. *See C.B.*, 611 N.W.2d at 494 ("The purpose of these limitations 'is to prevent children from being perpetually kept in foster care and to see that some type of permanent situation is provided for the child[].'"). Termination of the father's rights allows E.G. to be adopted and establish permanency with his new family. *See In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011) (recognizing "a child's safety and his or her need for a permanent home as the defining elements in a child's best interests"). This is in his best interests.

We affirm the termination of the father's parental rights.[2]

**AFFIRMED.**

---

[2] The father does not argue a permissive factor of section 232.116(3) applies, so we do not consider this step. *See In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010) (declining to address a step not disputed by the parent); *see also In re A.S.*, 906 N.W.2d 467, 476 (Iowa 2018) (confirming it is the parent's duty to establish that a permissive factor of subsection 232.116(3) applies).