# IN THE COURT OF APPEALS OF IOWA

No. 24-1803
Filed February 5, 2025

**IN THE INTEREST OF I.M., I.D., and I.D.,**
**Minor Children,**

**A.E., Mother,**
    Appellant,

**M.D., Father,**
    Appellant.

_____

        Appeal from the Iowa District Court for Linn County, Carrie K. Bryner, Judge.

        A mother and father separately appeal the termination of their parental rights. **AFFIRMED ON BOTH APPEALS.**

        Deborah M. Skelton, Pleasant Hill, for appellant mother.

        Michael M. Lindeman of Lindeman Law, Cedar Rapids, for appellant father.

        Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

        Katie Eastvold, North Liberty, attorney and guardian ad litem for minor children.

        Considered by Tabor, C.J., and Ahlers and Sandy, JJ.

**SANDY, Judge.**

A mother and father separately appeal the juvenile court's ruling terminating their parental rights. The mother challenges the statutory grounds for termination and asserts termination is not in the best interests of her children. The father likewise challenges the statutory grounds for termination and contends termination is not in his children's best interest.

Upon our de novo review of the record, we affirm.

## I.    Background Facts and Proceeding Facts

This appeal involves three young sisters—I.M., born in 2018; Im.D., born in 2020; and In.D.,[1] born in 2023. All three children share the same mother. However, B.M. is the father of I.M., while M.D. is the father of Im.D. and In.D.

The children have a long history of involvement with the Iowa Department of Health and Human Services (HHS). I.M. and Im.D. were previously the subjects of a child-in-need-of-assistance (CINA) case opened in March 2020 due to concerns the mother was using methamphetamine. There were also concerns B.M. assaulted his new girlfriend while I.M. was present.[2] I.M. and Im.D. were adjudicated in need of assistance and removed from the mother's custody. They were both placed in the custody of HHS for purposes of relative placement. However, reunification with the mother was ultimately achieved, and the case closed via separate bridge orders in February 2022. The bridge orders granted

---

[1] To distinguish between the two younger sisters, we refer to them as Im.D. and In.D. throughout this opinion.

[2] B.M. has cycled in and out of incarceration, and his role in I.M.'s life has been virtually nonexistent. At the time of the termination hearing, it was believed he was incarcerated.

sole legal custody and physical care of I.M. and Im.D. to the mother. During this time, the mother was in a relationship with M.D.[3]

The children again came to the attention of HHS eight months later in October 2022. HHS received information that the mother had recently relapsed with methamphetamine, which was confirmed by a positive drug test. Im.D. also tested positive for methamphetamine exposure, and it was determined the mother was the source of the exposure.

Additionally, HHS was alerted to reports that M.D. had assaulted the mother in front of I.M. and Im.D. M.D. "hit, dragged, and stomped" on the mother's neck. M.D. was subsequently arrested and incarcerated for this assault. A no-contact order was put in place between the mother and M.D., but this was violated repeatedly by both parties. The record reveals the mother and M.D. remained in close contact despite M.D.'s incarceration. After M.D. was released from incarceration in January 2023, the no-contact order was dismissed at the mother's request. The mother and M.D. resumed their relationship after M.D.'s release.

After receiving reports regarding the mother's methamphetamine use and M.D.'s assault on her, the State filed a CINA petition for I.M. and Im.D. on October 12, 2022. I.M. and Im.D. were subsequently adjudicated in need of assistance and placed in the custody of HHS for purposes of relative placement or foster family care. A few days after In.D.'s birth in April 2023, a CINA petition was filed on her behalf. She was later adjudicated a CINA and placed in the custody of HHS for purposes of foster family care or placement with a suitable other adult.

---

[3] The record reveals that sometime between the closure of 2020 CINA case and the subsequent CINA case, the mother became pregnant with In.D.

As the juvenile court highlighted in its thorough termination ruling, the mother and M.D. did not begin to meaningfully engage with services until March 2023.[4] The mother obtained a substance-use evaluation in March 2023 and shortly afterward began drug testing for HHS. Over the course of this case, the mother consistently tested negative for illicit substances.[5] However, the mother did not follow the recommendation contained in her initial substance-use evaluation due to her pregnancy with In.D. The mother obtained a second substance-use evaluation in the fall of 2023 and successfully complied with its recommendation of extended outpatient treatment.

However, the mother never obtained a psychological evaluation despite a court order to do so. The record reveals the mother attempted to complete a psychological evaluation in January 2023, but she became overwhelmed during the evaluation and did not finish. The mother did obtain a mental-health evaluation with no recommendations for treatment.

Similarly, M.D. completed a substance-use evaluation in April 2023. He complied with drug testing requirements for HHS and regularly tested negative for illicit substances. He also completed a psychological evaluation with cognitive testing, which raised concerns he may suffer from "borderline intellectual functioning." The record reveals HHS was concerned M.D. could not adequately care for himself and was overly reliant on the mother. Additionally, M.D. engaged

---

[4] B.M. did not participate in services throughout this case.
[5] The record reveals the mother tested positive once for alcohol in February 2024. This violated a previous juvenile court order that stated the mother was to abstain from alcohol use.

in some individual therapy to address his anger issues. But M.D. stopped attending therapy after four or five sessions.

The mother and M.D. also engaged in some services to address HHS's concerns over the history of domestic abuse in their relationship. For a few months, the mother and M.D. participated in couples counseling. However, this abruptly stopped, and the mother testified during the termination hearing that such counseling was "pointless." The mother reported to an HHS employee that she and M.D. had not been truthful about their relationship issues with their counselor. The mother and M.D. both successfully completed the SafeCare program—a program designed to address issues of child abuse and neglect. Additionally, M.D. completed the Iowa Domestic Abuse Program. However, the program was held virtually, and HHS received reports M.D. played video games during the program. M.D. also participated in the Caring Dads program, but he was dismissed from the program after missing too many sessions.

Despite participating in some services intended to address HHS's domestic-abuse concerns, episodes of domestic abuse between M.D. and the mother continued to occur. During an overnight visit with the children in February 2024, the police were called to respond to an incident of domestic abuse at the couple's apartment.[6] The mother denied that any domestic abuse occurred. M.D. was asked by officers to leave the apartment, but he refused. Instead, the mother and the children left the apartment to stay with relatives that evening. Whatever

---

[6] The mother and M.D. slowly progressed beyond fully supervised visits with the children. However, after the incident in February 2024, the mother and M.D. regressed to fully supervised visits.

happened in the couple's apartment that evening evidently occurred in front of some of the children because I.M. reported to the mother that she was scared during the incident. After this incident, the mother told HHS she ended her relationship with M.D.

But the record belies the mother's claim that she ended her relationship with M.D. In March, the police were again called to respond to a domestic-abuse incident at the couple's apartment. The evidence of record shows M.D. locked the mother in a closet. While speaking with the responding officers, the mother told them that M.D. had been staying at the apartment. Additionally, she told officers that M.D. received mail and kept personal property at the apartment.

The domestic abuse in the mother and M.D.'s relationship continued. In April, the police responded to another report of domestic abuse at the couple's apartment. After returning home from work one night, the mother was ambushed by M.D. when she entered the apartment. M.D. dragged the mother by her hair across the apartment. He also repeatedly made "closed fist strikes to her head." One responding officer noted that the mother had "discoloration on her forehead" and "clear abrasions" that were "beginning to turn purple." M.D. was arrested shortly afterward and was incarcerated. At the time of the termination hearing, he was still incarcerated.

Due to each parent's failure to make meaningful progress over the course of the underlying CINA case, the State petitioned to terminate the parental rights of the mother, M.D., and B.M. A termination hearing was held on May 10, 2024. The juvenile court subsequently terminated the parental rights of each parent. The mother's parental rights to I.M. were terminated pursuant to Iowa Code

section 232.116(1)(f) (2023). Her parental rights to Im.D. and In.D. were terminated pursuant to section 232.116(1)(h). M.D.'s parental rights to Im.D. and In.D. were also terminated pursuant to paragraph (h). B.M.'s parental rights to I.M. were terminated pursuant to paragraphs (b), (e), and (f) of the same code section.[7]

The mother and M.D. appeal separately.

## II. Standard of Review

"We review proceedings to terminate parental rights de novo." *In re A.B.*, 815 N.W.2d 764, 773 (Iowa 2012) (citation omitted). We give weight to the juvenile court's findings of fact, especially those concerning the credibility of witnesses, but we are not bound by them. *In re H.S.*, 805 N.W.2d 737, 745 (Iowa 2011).

## III. Analysis

Our analysis reviewing the termination of parental rights is a three-step process. *In re A.B.*, 957 N.W.2d 280, 294 (Iowa 2021). First, we determine whether any ground for termination under section 232.116(1) has been established by clear and convincing evidence. *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). If a ground for termination has been established, we then consider "whether the best interest framework as laid out in section 232.116(2) supports the termination of parental rights." *Id.* at 219–20. If we conclude termination of parental rights is in the best interests of a child, we then consider "whether any exceptions in section 232.116(3) apply to preclude termination." *Id.* at 220.

---

[7] B.M. does not appeal the termination of his parental rights.

"However, if a parent does not challenge a step in our analysis, we need not address it." *In re J.P.*, No. 19-1633, 2020 WL 110425, at *1 (Iowa Ct. App. Jan. 9, 2020).

We now address the mother's and M.D.'s arguments separately.

**A. Mother's Appeal**

*1. Statutory Grounds*

The mother's parental rights to I.M. were terminated pursuant to section 232.116(1)(f). This paragraph provides the juvenile court may terminate parental rights if all of the following have occurred:

> (1) The child is four years of age or older.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

Iowa Code § 232.116(1)(f). The mother's parental rights to Im.D. and In.D. were terminated pursuant to paragraph (h). This paragraph provides the juvenile court may terminate parental rights if:

> (1) The child is three years of age or younger.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

*Id.* § 232.116(1)(h). For all three children the mother only contests the fourth element of the two statutory grounds for termination—that the children cannot be returned to her custody at the present time. The "present time"—as used in section 232.116(1)(f) and (h)—means at the time of the termination hearing. *See In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010) (interpreting "present time" to mean "at the time of the termination hearing"). The mother contends the juvenile court incorrectly focused on the domestic violence between her and M.D. in concluding the children could not be returned to her custody at the time of the termination hearing. In essence, she argues she was improperly punished for "being a punching bag for [M.D.]" While somewhat sympathetic to the mother's arguments, we disagree.

Several facts from this case lead us to the conclusion that the children could not be returned to the mother's custody due to her failure to properly gain an appreciation of the dangers of domestic abuse. First, after the domestic abuse incident in October 2022, which occurred in front of two of the children, the mother chose to continue her relationship with M.D. This proved to be a tragic pattern throughout this case. In February 2024, the mother and M.D. were again involved in an alleged domestic-abuse incident. It is clear from the record that this incident unfolded in front of at least one of the children. Yet after this alleged domestic-abuse episode, the mother again chose to continue her relationship with M.D. She was then assaulted by M.D. twice over the next two months, with the last assault occurring one month before the termination hearing. This gives us little confidence the children could have been returned to the mother's custody at the time of the termination hearing. *See In re B.S.*, No. 20-1643, 2021 WL 609093, at *1 (Iowa

Ct. App. Feb. 17, 2021) (concluding a child could not be safely returned to the mother's custody due to her decision to continue her relationship with her abuser).

Second, like the juvenile court, we have doubts the mother's relationship with M.D. has ended for good. After the alleged domestic-abuse incident in February 2024, the mother told HHS that she had ended her relationship with M.D. However, after she was abused by M.D. a month later, the mother told a responding police officer that M.D. was living with her. And although M.D. is currently incarcerated and the mother testified at the termination hearing that she has no plans to continue her relationship with him, we note the juvenile court expressly found this testimony to be lacking credibility. And for pragmatic reasons we defer to the juvenile court's witness credibility determinations. *See Hora v. Hora*, 5 N.W.3d 635, 645 (Iowa 2024) ("It is pragmatic [to defer] because the [juvenile] court has a front-row seat to the live testimony, viewing the demeanor of both the witness as she testifies and the parties while they listen, whereas our review is limited to reading black words on a white page of a sterile transcript."). Given the mother's previous lie regarding the status of her relationship with M.D., we see no reason to disturb the juvenile court's credibility determination on this issue.

Third, as the juvenile court noted in its ruling, there is evidence in the record that the mother attempted to diminish the impact the domestic abuse had on some of the children. Following the February 2024 incident, I.M. reported to the mother that she was scared during the alleged domestic abuse because "she didn't want [M.D.] to hurt" the mother. When asked about this at the termination hearing, the mother attempted to downplay this and stated, "[I.M.] is always scared." This

bolsters our conclusion the mother does not fully appreciate the dangers domestic abuse poses to her children's physical and emotional wellbeing. *See L.C.-M.*, No. 20-1661, 2021 WL 1400762, at *2 (Iowa Ct. App. Apr. 14, 2021) (concluding the child could not be returned to the mother's custody at the time of the termination hearing because the mother did not "understand the full dangers" of the child witnessing domestic abuse).

Accordingly, we conclude the juvenile court correctly determined the children could not be returned to the mother's custody at the time of the termination hearing.

### 2. Best Interests

The mother also contends termination of her parental rights is not in the children's best interests. As she states in her petition, "[t]here is no authority that allows the State to terminate a parent-child relationship where the children love the mother, the mother loves the children, the mother can meet the physical and emotional needs of the children, and placement with the mother poses no appreciable risk of adjudicatory harm." Additionally, she suggests the close bond she shares with the children demonstrates termination would not be in their best interests. We disagree.

In analyzing whether termination is in the best interests of children, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). The defining elements of the best-interest analysis are children's safety and the need for a permanent home. *H.S.*, 805 N.W.2d at 748.

We start our analysis by recognizing that the bond between a parent and child may be considered in conducting a best-interest analysis. *See B.S.*, 2021 WL 609093, at *1 (considering the close bond between a mother and child as part of the best-interest analysis). But even taking into consideration the close bond between the mother and her children, we conclude termination of her parental rights is in their best interests. Given the mother may be continuing her relationship with M.D., we have serious concerns for the children's safety. And as mentioned, the safety of children is a paramount concern in assessing children's best interests. *See In re J.E.*, 723 N.W.2d 793, 802 (Iowa 2006) (Cady, J., specially concurring) (noting a child's safety is of "paramount importance" in determining their best interests). At least some of the children have already witnessed violence between the mother and M.D. We cannot turn a blind eye to this fact with the hope that such behavior will not continue in the future. *See In re P.L.*, 778 N.W.2d 33, 41 (Iowa 2010) (noting courts cannot deny children stability "by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child.").

Additionally, we note the children have been removed from the mother's custody for a significant period of time. The children have each formed a close bond with their respective placements. And by all accounts, their needs have been fully met within the care of their placements. Further, the record indicates the children would likely remain with their current placements if the mother's parental rights are terminated. Terminating the mother's parental rights will give the children an opportunity to achieve much needed permanency. *See In re A.M.*, 843 N.W.2d 100, 112 (Iowa 2014) (finding termination was in the child's best interests because it would enable the child to achieve permanency).

Therefore, we conclude terminating the mother's parental rights is in the best interests of the children.[8]  Accordingly, we affirm the termination of her parental rights.

### B. Father's Appeal

#### 1. Statutory Grounds

Like the mother, M.D.'s parental rights to Im.D. and In.D. were terminated pursuant to section 232.116(1)(h).  And similar to the mother, he only contests the fourth element—that the children could not be returned to his custody at the "present time."  *See* Iowa Code § 232.116(h)(1)(4).  We disagree.

We find the evidence compelling that the children could not be returned to M.D.'s custody at the time of the termination hearing.  Despite engaging in some services to address his issues with committing domestic abuse, M.D. continued to abuse the mother throughout this case.  *See In re B.M.*, No. 21-0334, 2021 WL 3392764, at *2 (Iowa Ct. App. Aug. 4, 2021) (finding the children could not be returned to the father's custody at the time of termination because, despite participating in services to address domestic abuse, the father continued to commit

---

[8] In her petition on appeal, the mother cites the close bond between herself and the children as a reason for why termination is not in the children's best interests. She cites Iowa Code section 232.116(3)(d)—a permissive exception to termination—which provides a court need not terminate if "[t]here is clear and convincing evidence that termination would be detrimental to the child at the time due to the closeness of the parent-child relationship."  We read the mother's petition to argue termination is not in the children's best interests due to the closeness of her bond with them.  But to the extent the mother intended to argue a permissive exception to termination based on the parent-child bond, we find such a claim was not preserved for appeal because it was never raised before or ruled upon by the juvenile court.  *See In re E.W.*, No. 22-0647, 2022 WL 2347196, at *3 (Iowa Ct. App. June 29, 2022) (finding a father did not preserve error on his permissive-exception argument because he failed to raise the claim to the juvenile court).

acts of domestic abuse). Further, at the time of the termination hearing, M.D. was incarcerated. *See In re B.R.*, No. 17-1412, 2017 WL 5179025, at *1 (Iowa Ct. App. Nov. 8, 2017) ("[T]he record is clear that the father was incarcerated at the time of the termination hearing, would be for the foreseeable future, and, therefore, was not in a position to have custody of the child then or in the near future.").

Accordingly, we are more than satisfied that clear and convincing evidence established that M.D.'s children could not have been returned to his custody at the time of the termination hearing.

*2. Best Interests*

M.D. also asserts termination of his parental rights is not in his children's best interests. To advance this argument, his petition on appeal merely states, "[i]n the instant case, termination is not in the child's best interests." This cursory argument is not sufficient to properly raise an issue for appellate review. *See In re A.V.*, No. 23-1916, 2024 WL 1757554, at *5 (Iowa Ct. App. Apr. 24, 2024) ("Without developing how the facts in this record support [his] position or citing legal authority, we find that this argument is waived." (alteration in original)). Therefore, we decline to address this argument.[9]

We thus affirm the termination of M.D.'s parental rights.

---

[9] In his petition, M.D. also makes an assertion that, "based on the history of this case," there should have been "an additional period of time for rehabilitation services." But because M.D. never raised this claim to the juvenile court, we find he has not preserved error on such a claim. *See E.W.*, 2022 WL 2347196, at *3.

## IV.     Conclusion

In sum, we affirm the juvenile court's ruling terminating the mother's and M.D.'s parental rights.

**AFRFIRMED ON BOTH APPEALS.**