# IN THE COURT OF APPEALS OF IOWA

No. 14-2115
Filed October 28, 2015

**IN THE INTEREST OF K.W.,**
  **Minor Child,**

**A.C.,**
  Petitioner-Appellant,

**vs.**

**R.W.,**
  Respondent-Appellee.
_____

Appeal from the Iowa District Court for Sac County, Adria Anne Downey Kester, District Associate Judge.

A mother appeals the dismissal of her petition to terminate the parental rights of her daughter's biological father. **AFFIRMED**.

Gina C. Badding of Neu, Minnich,Comito & Neu, P.C., Carroll, and Erin E. McCullough of the Law Offices of Erin E. McCullough, Lake View, for appellant.

Andrea M. Smook of Cornwall, Avery, Bjornstad, Scott & Davis, Spencer, for appellee.

Charles A. Schulte, Sac City, attorney and guardian ad litem for minor child.

Considered by Danilson, C.J., and Vogel and Tabor, JJ.

**TABOR, Judge.**

The father of ten-year-old K.W. may have "come awfully late to the dance"—in the words of the girl's guardian ad litem—but he is now "sincere in his desire to be a part of [his daughter's] life." Because we agree with the district court that termination of the father's parental rights was not in K.W.'s best interests, we affirm the dismissal of the mother's petition.

## I.        Background facts and proceedings

Robert had just graduated from high school when his child, K.W. was born in 2004. The mother, Alicia, was twenty-two years old. Following K.W.'s birth, Alicia and Robert shared an apartment for almost five months, though Alicia recalls Robert spending more time at his parents' home. Alicia and Robert have divergent memories of Robert's participation in the child care duties. Alicia testified he did not help. Robert testified he changed diapers and fed the baby. They agree their relationship deteriorated.

Twice during 2005 and 2006, Robert assaulted Alicia. After the second incident of domestic violence, Alicia ended their relationship. She obtained a no-contact order prohibiting Robert from interacting with her or K.W. But a few months later, Alicia asked for the no-contact order to be dropped. Robert took responsibility for the assaults and completed a batterer's education program. Robert and Alicia had little contact after 2006.

Alicia gave birth to a second daughter in 2007. Both she and Robert assumed Robert was the father of that child as well, but a paternity test in 2014 proved them wrong. Also in 2007, Alicia began dating Scott. The couple married

in November 2014, about two weeks before the termination hearing. Both K.W. and her half-sister consider Scott to be their father.

In 2008, Robert's father died and Robert went to Alicia's residence to ask if he could take K.W. to the funeral. She left open the possibility, but when Robert called to firm up the plans, Scott told Robert it was not a good idea and hung up. Also in 2008, Robert had a chance encounter with Alicia, Scott and K.W. in the Storm Lake Walmart. Alicia turned K.W.'s head and kept walking so the girl would not see Robert; it was Scott who approached Robert, getting "in his face." The animosity between the two men came to a head in 2009, when Scott was arrested for assaulting Robert. Robert testified after the assault he was intimidated to ask for visitation with K.W. with Scott present in the home.

Robert had a rare interaction with K.W. in November 2009 at a family birthday party. He testified she knew who he was and "opened up very quickly" during their conversation. Robert also spent time with K.W. the following day at a local water park, though Alicia believed K.W. was in the care of her aunts and did not know Robert was going to be there. Alicia was open to K.W. spending time with her paternal aunts, but the aunts were afraid if Alicia knew they allowed Robert contact with K.W. they would not be able to continue seeing their niece.

In 2009, Robert married Tabbatha; they now have two sons. Starting in 2009, Tabbatha communicated with Alicia through electronic means, asking for information about K.W. and seeking visitation. Robert testified he used Tabbatha as a go-between in an effort to "get everything rolling." He continued: "I thought because of two females, that could work." Instead, Alicia resented the fact that

Robert was not the one asking for visitation; Alicia testified: "it was just Tabbatha asking, not Robert and Tabbatha." Alicia's messages to Tabbatha were peppered with cursing and name-calling. The district court accurately described Alicia's communications as filled with "extreme bitterness and vitriol."

Robert interacted with K.W. and Alicia at a family birthday party in October 2013. During their conversation, K.W. shared with Robert how well she was doing in school, recently being accepted into the talented-and-gifted program.

Although Robert has been employed full time since 2009, he has provided very little financial support for K.W. over the years. In an isolated incident in 2012, Robert gave Alicia money so that K.W. could participate in a beauty pageant. Alicia and Scott experienced financial trouble in 2014, so Robert agreed to pay $200 toward Alicia's gas bill in March 2014. Later that same month, Robert paid $90 for K.W.'s tee-ball registration and $40 for her to participate in soccer, also buying her shoes, shin guards, and a soccer ball. In April 2014, Robert provided Alicia with a cashier's check for $225.

Also in 2014, Alicia called the Child Support Recovery Unit (CSRU) for help in obtaining child support from Robert.[1] Robert was ordered to pay child support and had consistently made his payments. Robert and his wife have

---

[1] An attorney for the CSRU filed a response to Alicia's termination petition, and while making no recommendation, noted that terminating Robert's rights would transfer his financial obligation to K.W. to Alicia, who has demonstrated a need for public assistance, or to the taxpayers of Iowa.

asked numerous times since the entry of the child support order to have visitation with K.W., only to have those requests denied by Alicia.[2]

On September 22, 2014, Alicia filed a petition to terminate Robert's parental rights. Robert filed an answer, asking the court to deny the petition. The court held a two-day hearing in late November 2014. Alicia and Robert both testified, as did their spouses and other extended family members. Alicia told the court that if Robert's parental rights were terminated, Scott planned to adopt K.W. and her half-sister. Robert testified he wanted to maintain his parental rights, set up visitation with K.W. and to "try to make up for lost time."

In an order issued on December 2, 2014, the court dismissed Alicia's termination petition, concluding termination was not warranted because during the last seven years Alicia prevented Robert from starting a relationship with K.W. The court also concluded termination was not in K.W.'s best interest.

Alicia appeals.

## II. Standard of Review

We conduct a de novo review of termination proceedings under chapter 600A. *In re C.A.V.*, 787 N.W.2d 96, 99 (Iowa Ct. App. 2010). We defer to the factual findings of the juvenile court, especially findings related to witness credibility, but we are not bound by them. *In re G.A.*, 826 N.W.2d 125, 127 (Iowa Ct. App. 2012). When interpreting chapter 600A, the best interest of the child

---

[2] Alicia called the visitation requests "harassment" and threatened to call law enforcement. She testified she denied the requests because Robert's payments of child support were "drama filled."

involved is "the paramount consideration," but we also give "due consideration" to the interests of the child's parents. Iowa Code § 600A .1.

The parent petitioning for termination has the burden to show the other parent has abandoned the child. Iowa Code § 600A.8(3)(b); *G.A.*, 826 N.W.2d at 129. The juvenile court's termination findings must be based on clear and convincing proof. Iowa Code § 600A.8.

## III.   Analysis

### A.  Evidence of Abandonment

Alicia's petition for termination of Robert's parental rights alleged he had abandoned K.W. under 600A.8(3)(b). Abandonment is defined as "reject[ing] the duties imposed by the parent-child relationship. That rejection may be shown when the parent, "while being able to do so, mak[es] no provision or mak[es] only a marginal effort to provide for the support of the child or to communicate with the child." *See* Iowa Code § 600A.2(19).

A parent is deemed to have abandoned a child who is six months of age or older

> unless the parent maintains substantial and continuous or repeated contact with the child as demonstrated by contribution toward support of the child of a reasonable amount, according to the parent's means, and as demonstrated by any of the following:
>         (1) Visiting the child at least monthly when physically and financially able to do so and when not prevented from doing so by the person having lawful custody of the child.
>         (2) Regular communication with the child or with the person having the care or custody of the child, when physically and financially unable to visit the child or when prevented from visiting the child by the person having lawful custody of the child.
>         (3) Openly living with the child for a period of six months within the one-year period immediately preceding the termination of

parental rights hearing and during that period openly holding himself or herself out to be the parent of the child.

*Id.* § 600A.8(3)(b).  A parent's subject intent, "whether expressed or otherwise, unsupported by evidence of acts specified in paragraph 'a' or 'b' manifesting such intent, does not preclude a determination that the parent has abandoned the child."  *Id.* § 600A.8(3)(c).

Under section 600A.8(3)(b), the threshold element of "substantial and continuous or repeated contact" is economic contributions.  The district court found: "There is no question that Robert failed to support his daughter emotionally and financially from her birth until early in 2014."  The court noted that despite his consistent employment since 2009, Robert has provided "meager financial support" for K.W.  We agree with the district court's assessment.  Under the predicate language of section 600A.8(3)(b), Robert has abandoned his daughter.  *See In re W.W.*, 826 N.W.2d 706, 710 (Iowa App. 2012).  Because Robert is deemed to have abandoned his child under the financial support element, we need not consider whether Alicia prevented Robert from visiting or having regular communication with K.W. under subparagraphs (b)(1) and (2).

### B. Child's Best Interest

After the petitioning parent has established the statutory grounds for termination, that parent must also prove termination of the other parent's rights is in the best interests of the child.  *In re R.K.B.*, 572 N.W.2d 600, 602 (Iowa 1998).

We now turn to the question of K.W.'s best interests, giving "due consideration" to the interests of Alicia and Robert. *See* Iowa Code § 600A.1.[3]

After our de novo review of the record, we reach the same conclusion as the district court—termination of Robert's parental rights is not in K.W.'s best interest. In setting out an analytical framework to determine the best interest of the child under chapter 600A, our supreme court has found the parallel provisions in section 232.116(2)[4] to be a useful guide. *In re A.H.B., M.L.B., J.J.B.*, 791 N.W.2d 687, 690 (Iowa 2010). There, one of the important considerations is the child's emotional and psychological health. *Id.*

By all accounts, K.W. is a bright, active, and well-adjusted child. She remembers few interactions with her biological father Robert. After interviewing K.W. and Alicia, the guardian ad litem (GAL) recommended Robert's rights be terminated. But after meeting with Robert and his wife Tabbatha, the GAL filed an addendum, explaining to the court that Robert "appears to genuinely regret" not doing more to maintain a relationship with K.W. The GAL found Robert sincere in his desire to become a part of his daughter's life. At the conclusion of the termination hearing the GAL told the court that K.W. understood Robert was

---

[3] Section 600A.1 addresses the factors in the best-interests analysis:
> The best interest of a child requires that each biological parent affirmatively assume the duties encompassed by the role of being a parent. In determining whether a parent has affirmatively assumed the duties of a parent, the court shall consider, but is not limited to consideration of, the fulfillment of financial obligations, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of the establishment and maintenance of a place of importance in the child's life.

[4] "In considering whether to terminate the rights of a parent under this section, the court shall give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child."

her "real dad" and although she does not know him well, she knows who he is, "enjoys talking to him," and "likes him." The record does not support Alicia's argument that it was necessary for K.W.'s emotional and psychological health to terminate Robert's parental rights. *See In re D.E.E.*, 472 N.W.2d 628, 630 (Iowa Ct. App. 1991) (reversing termination of parental rights because children were better served by maintaining legal relationship with their father).

Robert was a teenager when K.W. was born, and the record shows he has matured a great deal since then. He is now financially secure and maintains a stable household with his wife Tabbatha, who has been supportive of Robert's efforts to start a relationship with K.W. Tabbatha has tried to broker visitation for Robert, but Alicia has denied the requests. Tabbatha testified she and Robert would like for K.W. to have a relationship with their sons. Our law recognizes the value of fostering relationships among siblings and half-siblings. *See generally In re Marriage of Orte*, 389 N.W.2d 373, 374 (Iowa 1986). Robert told the GAL that he understood initiating visitation with K.W. would have to be a gradual process to accommodate her comfort level.

Robert's sisters also have strived to maintain a connection with K.W. Alicia testified she agrees it is important for K.W. to have a relationship with her aunts and cousins. We find the nurturing available to K.W. from Robert's extended family supports the district court's denial of the petition to termination Robert's parental rights. *See generally Dale v. Pearson*, 555 N.W.2d 243, 246 (Iowa Ct. App. 1996) (highlighting importance of support of extended family in custody determination).

Finally, in regard to financial assistance, since he was ordered to pay child support, Robert has been consistent in his payments. Alicia argues on appeal that Robert's parental support obligation does not "trump" the best interest factors in section 600A.1. We agree with that as a general proposition. But the circumstances here show termination is not otherwise in K.W.'s best interest. *Cf. In re H.S.*, 805 N.W.2d 737, 745–46 (Iowa 2011) (holding potential elimination of child support should not affect the termination of parental rights under chapter 232 if termination is otherwise in the child's best interests).

While he admittedly could have put forth much greater effort, Robert did make gestures to sustain a relationship with K.W., but the hostility from Alicia and Scott since 2007 has loomed as a major deterrent. Since his marriage to Tabbatha, Robert has tried to re-establish a relationship with K.W., but Alicia has thwarted those efforts. Robert's provision of financial assistance to Alicia in 2014, and his consistent payment of his child support obligation as ordered by the court, signals his commitment to affirmatively assuming the duties of a parent as required under section 600A.1. We are also persuaded by the GAL's assertions that Robert is sincere in his desire to assume a place of importance in K.W.'s life. For these reasons, we conclude termination of Robert's rights would not be in the best interests of his daughter.

**AFFIRMED.**