# IN THE COURT OF APPEALS OF IOWA

No. 18-0015
Filed October 10, 2018

**IN THE INTEREST OF R.S. and L.S.,**
**Minor Children,**

**D.P., Mother,**
    Petitioner-Appellant,

**Z.S., Father,**
    Respondent-Appellee.

_____

Appeal from the Iowa District Court for Sac County, Joseph B. McCarville, District Associate Judge.

A mother appeals from the district court order denying her petition to terminate the parental rights of the father to their two children. **REVERSED AND REMANDED WITH INSTRUCTIONS.**

Alyssa A. Kenville of Kenville Law Firm, PC, Fort Dodge, for appellant mother.

Chira L. Corwin of Corwin Law Firm, Des Moines, for appellee father.

Considered by Danilson, C.J., and Vogel and Tabor, JJ.

**DANILSON, Chief Judge.**

A mother appeals from the district court order denying her petition to terminate the parental rights of the father to R.S. and L.S. Because there is clear and convincing evidence the father abandoned his children, as that term is used in Iowa Code sections 600A.2(19) and 600A.8(3)(b) (2017); because the mother did not prevent the father from visiting or communicating with the children; and because termination is in the children's best interests, we reverse the district court and remand with instructions to enter an order terminating the father's parental rights.

**I. Background Facts & Proceedings.**

Twins R.S. and L.S. were born in 2009. Their parents were never married but cohabitated at the time the children were born. The mother worked full time when the children were born, and the father was unemployed. After the children were born, the father worked odd jobs varying five to twenty hours per week. The parents disagreed about the extent the father cared for the children when they were infants, but after the mother went back to work, the children were sometimes placed in daycare. The couple separated in early 2010 when the children were roughly fifteen months old. The father moved in with his mother. R.S. and L.S's mother moved in with C.P., who later became her husband. The children do not know their biological father is related to them. They see C.P. as their father. C.P. has financially supported and raised the children since 2010.

After the parties separated, there was no set arrangement for visitation. The father would sometimes contact the mother and attempt to set up a time to see the children. The mother has had the same telephone number since 2010, and the

father has known her number since they separated. In late 2010, the mother, C.P., and the children moved roughly an hour's drive away from the father. Since 2010, the father's contacts with the children have been sporadic and minimal.

The father testified that a few times per month in 2010, 2011, and 2012 he would request to visit the children. He testified he made these requests via calling, text message, or Facebook. The father claimed he did not have a record of the calls or texts because he no longer had the cell phones used for those contacts. The father testified the mother did not always answer his calls or respond to his messages. The father acknowledged he did not request to visit the children in 2013, 2014, 2016, or 2017. The father testified about one request to visit the children in 2015, which was granted, and another request which apparently did not work out.

In 2010, the father saw the children two times for between forty-five minutes and an hour. The parties disagreed whether the father had contact with the children in 2011.[1] Between 2012 and 2013, the father saw the children four times; the visits ranged from twenty minutes to an hour. Neither party could recall whether the father saw the children in 2014. In August 2015, the parties had a chance meeting when both were camping at the same campground. The father saw the children for roughly fifteen minutes. The father did not visit the children in 2016 or 2017. The father has never been to the children's school, never contacted the children's teachers, never attended a parent-teacher conference, never attended a school program, and never attended the children's dance recitals.

---

[1] If any contact occurred in 2011, no evidence or testimony was presented showing how many contacts, how or where the contacts occurred, or for how long.

At some point after the parties separated, the Child Support Recovery Unit contacted the mother because the children were receiving state assistance. The father was required to pay ten dollars per month per child initially, and that obligation later rose to twelve dollars per month per child. In 2010, the father attempted to give the mother $200, but C.P. threw the money into the father's car while the two cars were next to each other at a red light and yelled "we don't need your money." In 2012, the father sent the mother $100, which was apparently accepted. The father testified he purchased birthday, Easter, and Christmas presents for the children "about every year." These gifts were sometimes sent to the children by their paternal grandmother. The mother disputed the father sent gifts but admitted she could not tell who purchased the gifts sent by the grandmother.

After the 2015 chance meeting, the mother filed a request to adjust the child-support order. The father opposed adjusting the child support because he did "not get to see [the children] due to their mother's choices" and requested a hearing. The father also opposed adjustment of his support obligation because he was expecting another child with his current girlfriend, K.M. Neither party was represented by counsel at the resulting mediation. The mother verbally withdrew her request for an adjustment of the child-support obligation, and the father agreed with the withdrawal and did not wish to proceed with an adjustment.

In March 2017, the father filed a petition requesting the court grant him physical care of the children. In that petition, the father asked for a temporary hearing to establish visitation. No hearing was ever set, apparently due to inaction by the father's previous attorney. In August 2017, the mother filed the petition to

terminate the father's parental rights. In September 2017, the father fired his previous attorney and hired his current one.

A hearing on the petition to terminate the father's parental rights was held in November 2017. The mother, C.P., and the guardian ad litem testified in favor of termination. The father, his girlfriend, his sister, and his mother testified against termination. The mother claimed the father had abandoned his children by failing to maintain substantial, continuous, or repeated contact.[2] The father claimed he was prevented by the mother from maintaining substantial, continuous, or repeated contact.

The fighting issue at the hearing was whether the mother prevented the father from maintaining contact with the children. The father presented a string of undated back-and-forth messages on Facebook—purportedly from March 2015—as evidence of the mother's obstruction. Those messages read:

> Father: "So are you going to let me see the girls the Saturday before Easter or not"
> Mother: "Y r u being so rude."
> Father: "I'm not"
> Mother: "Whatever."
> Father: "I just asked a question"
> Mother: "Where"
> Father: "Where you want to meet"
> Mother: "You"
> Father: "What?"
> Mother: "Where do you want to?"
> Father: "Meet half way"
> Mother: "Who is coming,"
> Father: "[K.M.] and her son and maybe my mom and dad"
> Father: "And [H.S.] maybe"
> Mother: "Hum. Ic"

---

[2] The mother also claimed the father failed to provide child support or other assistance. The record shows the father was current on his child-support obligation of twenty-four dollars per month. We find it unnecessary to reach the merits of this claim to resolve this appeal.

Father: "What they can't come with"
Father: "I want them to"
Father: "????"
Mother: "I will see, I work"
Father: "I'm giving you plenty of time to figure that stuff out over a week"
Father: "Hello"
Mother: "Yea?"
Father: "So wats the deal"
Mother: "Where is there to meet"
Father: "[halfway-point]"
Mother: "At the park.. We can't stay long tho."
Father: "How long it long [sic] really I don't get to see them much"
Mother: "Hour tops."

The father also presented August 2015 Facebook messages between the mother and his girlfriend in which the girlfriend offered school supplies and clothes to the children, and the mother refused the offer.

The father testified the mother would not always answer his phone calls, respond to his voice mails, or answer text messages. He testified sometimes they would try to figure out a time to meet, but the plans did not always "pan out." He testified the mother blocked him on Facebook in either 2015 or 2016. He testified he did not see the children in spring 2015 because the mother "always had something come up." The father testified that at the chance 2015 meeting at the campground he was told he could not tell the children he is their father. The mother disputed she or C.P. told the father not to tell the children he is their father.

The father's girlfriend, K.M., also testified. At the time of the hearing, K.M. had been with the father for five years. K.M. was present at the 2015 chance encounter. K.M. testified C.P. told the father not to "say anything stupid," but testified no other directives were given. K.M. testified the father had told her he called and texted the mother about visiting the children, but K.M. had not seen the

texts or call logs. Aside from the August 2015 Facebook messages, K.M. has not had other phone or text conversations with the mother. K.M. was not aware whether the father had ever tried to call and talk to the children.

The father's sister, H.S., also testified. H.S. and the mother used to be close friends. At the time of the hearing, they still exchanged text messages on a near-daily basis. After the mother, C.P., and the children moved away in 2010, H.S. maintained a relationship with the mother and children. H.S. testified the children call her "aunt." For some period of time, the mother shared pictures of the children with H.S. H.S. testified she thought the mother would not be happy if H.S. shared those photos with the father. H.S.'s relationship with her brother was strained due to her relationship with his children. H.S. helped do the children's hair and makeup for their dance recitals, and she watched some recitals. H.S. last saw the children in summer 2016. In the summer of 2017, H.S. made plans to meet with the mother and children at the state fair.[3] H.S. perceived the mother thought the father might be with H.S. at the fair, and the meeting did not happen. H.S. testified the father told her he texted the mother about visitation. H.S. never saw those text messages. H.S. was never present for a conversation between the father and mother regarding visitation. H.S. testified her knowledge of the mother's efforts to prevent contact with the father was based only on what the father told her.

The father's mother, V.S., also testified. V.S. testified she had not seen the children since 2013 or 2014. She testified she thought this was because the

---

[3] We take judicial notice of the fact that the 2017 Iowa State Fair took place August 10 through 20—after the father filed his petition for physical care but before the petition for termination of parental rights.

mother did not want V.S. to see the children. V.S. also testified she had not attempted to set up a visit with the children since 2013. She testified she was unsure whether the mother would respond to texts or calls from herself. V.S. had received photos of the children from the mother. V.S. testified she tried to set up visits, but things had not always "worked out." She testified to one incident in the past three years in which plans to meet were cancelled. V.S. testified the father told her he had texted or called the mother regarding visitation. She testified her knowledge about the mother preventing the father from contacting the children was based on the father's own statements.

The juvenile court ruled against terminating the father's parental rights. The court observed it was difficult to determine how much effort the father made in trying to see his children. The court also observed it was difficult to determine whether the mother interfered with those efforts. The court concluded there was not clear and convincing evidence the father abandoned the children because the mother had "impeded his ability to communicate and maintain contact with his children." The court found the following facts supported its conclusion the mother impeded the father:

> —[H.S.] has to be careful not to share pictures of [the children] with [the father] or [the mother] will not like it and might stop having contact with her.
> —[The mother] would not give [the children's] sizes to [their grandmother] so she could buy or make them clothes.
> —[The father] gave money to [the mother], and [C.P.], presumably in the presence of [the children], threw it out the window of a car toward [the father's] car, stating we don't need your money.
> —[The father] messaged [the mother] regarding visitation.
> —[The mother] cancelled a meeting with [H.S.] at the State Fair because she thought [the father] might be along.
> —[C.P.] stated the girls use his last name at school. This is puzzling as [the mother's] last name was [different] prior to her

marriage in April of 2017. The fact that [the children] used a live-in boyfriend's name at school is hard to believe.

—[C.P.] says the girls don't care about [the father], to be sure, [the father] could have done more and is not blameless, but the mother of the children should help foster a relationship with the children's father and the court finds she not only did not help foster a relationship she interfered with the same.

—Exhibit F dated December 2015 shows that [the father] was publicly complaining of [the mother's] interference almost two years ago.

—The petition to gain custody [] filed by [the father] is the most telling evidence that he has not abandoned the children, he took the time and spent the money to start legal action to see the kids.

—[The mother's] response to [the father's] petition for custody and visitation was to file a termination petition! This is consistent with interfering with child visitation and impeding a relationship between [the father] and [the children].

The court further concluded, "[The mother] doesn't get to keep [the children] in the dark or mislead them as to who their father is and then claim that is a valid reason for terminating the father's paternal rights." The court also observed, "Children can't have too many people that love and care for them. . . . [The father] is not blameless and he could have done more but the court does not find clear and convincing evidence of willful abandonment." The court found the testimony about the father sending the children birthday and Christmas presents credible. The court also concluded termination was not in the best interests of the children.

**II. Standard of Review.**

We review termination proceedings under chapter 600A de novo. *In re C.A.V.*, 787 N.W.2d 96, 99 (Iowa Ct. App. 2010). "We give deference to the factual findings of the juvenile court, especially those relating to witness credibility, but we are not bound by those determinations." *In re G.A.*, 826 N.W.2d 125, 127 (Iowa Ct. App. 2012). Our paramount consideration is the best interests of the child. Iowa Code § 600A.1.

**III. Analysis.**

**A. Abandonment.**

The mother claims grounds for termination exist because the father has not maintained substantial and continuous or repeated contact with the children. The father contends he was prevented from maintaining contact by the mother.[4]

A parent's rights may be terminated for abandoning a child. *Id.* § 600A.8(3). As used in chapter 600A, to abandon a child "means that a parent . . . rejects the duties imposed by the parent-child relationship . . . which may be evinced by the person . . . making only a marginal effort to provide for the support of the child or to communicate with the child." *Id.* § 600A.2(19). Section 600A.8(3)(b) provides further that a child older than six months is "deemed abandoned" unless the parent maintains substantial and continuous or repeated contact with the child as demonstrated by contribution toward support of the child of a reasonable amount, according to the parent's means, *and* as demonstrated by any of the following:

> (1) Visiting the child at least monthly when physically and financially able to do so and when not prevented from doing so by the person having lawful custody of the child.
> (2) Regular communication with the child or with the person having the care or custody of the child, when physically and financially unable to visit the child or when prevented from visiting the child by the person having lawful custody of the child.

---

[4] The father also claims error was not preserved because the mother did not file a post-trial motion seeking a ruling on any of the errors of findings of fact or law alleged in her brief. The issue of abandonment was presented to and resolved by the trial court—the court did not fail to resolve the issue. No post-trial motion was needed. *See State Farm Mut. Auto. Ins. Co. v. Pflibsen*, 350 N.W.2d 202, 206 (Iowa 1984) (noting a post-trial motion is "essential to preservation of error when a trial court *fails* to resolve an issue, claim, defense, or legal theory properly submitted to it for adjudication" (emphasis added)). Error was preserved.

We find there is clear and convincing evidence that the father has failed to maintain monthly visitation with either child and has not maintained regular communication with either child. The father's own testimony was that he had not seen the children since 2015—and that visit was a chance encounter. The father's attempts to remain in contact with his children were feeble at best. The father did not request to visit the children in 2013, 2014, 2016, or 2017, and the one request in 2015 occurred after he saw the children, by chance, at a campground. The father waited seven years after the parties separated to file an action seeking custody or visitation. We agree with the guardian ad litem's assessment that it was the father's lack of interest, rather than any acts of denial by the mother, that caused the lack of contact with the children. The father cannot point to a single incident in which the mother refused to allow him contact with the children.

The father's vague claims that "something always came up" only minimally support his contention the mother prevented him from having contact with the children, and his claims are unsubstantiated by other evidence. Certainly, a pattern of scheduled visits repeatedly cancelled could constitute interference—but there is no evidence that occurred here. His witnesses' knowledge about alleged interference from the mother was based solely on his statements to his witnesses. The father's undated Facebook messages, purportedly from March 2015, actually suggest the mother attempted to *allow* visitation—not that she prevented it. Assuming the messages were from March 2015, the father had not seen the children in more than a year at that time. The mother appears to attempt to work out a meeting despite her work obligations (and any other plans she might have had for the holiday weekend) on a week's notice. The fact that the mother wanted

to limit the visit to an hour was reasonable under the circumstances. The mother testified this visit likely did not work out because of her work schedule (while noting she was unsure when the undated conversation took place). The father's vague, unsubstantiated claims do not show the mother prevented him from having contact with the children.

Nor do the juvenile court's findings of fact support its conclusion the mother prevented the father from communicating with and visiting the children. H.S.'s perception that the mother would be angry if H.S. shared pictures with the father is not indicative of whether the mother prevented the *father* from communicating with and visiting the children. The fact the mother refused to give the grandmother the children's clothing sizes is not indicative of whether the mother prevented the *father* from communicating with and visiting the children. The fact that in 2010—mere months after the mother and father separated—the mother and C.P. refused the father's money and threw it at him through the car window is also not indicative of whether the mother prevented the father from communicating with and visiting the children during the subsequent seven-year period.

The fact the father messaged the mother about visitation, without more, is not indicative the mother prevented the father from maintaining contact with the children. Although H.S. believed the mother cancelled a meeting at the 2017 state fair due to worries the father would be present, this is not evidence the mother was avoiding contact with the father but is simply H.S.'s subjective opinion.

We find no support of interference by the children's use of C.P.'s surname at school. The father's failure to be a meaningful part of the children's lives has

undoubtedly caused the mother to use the last name of the only father the children have ever really known.

We agree with the juvenile court that parents should foster a relationship with the noncustodial parent for the best interests of the children. However, in the context of proving grounds for termination of parental rights, "the court shall not require a showing of diligent efforts by any person to encourage the parent to perform the acts specified" in Iowa Code section 600A.8(3)(a) or (b). Iowa Code § 600A.8(3)(c). Thus, the father may not defend the termination of his parental rights on the fact that the mother did not foster or encourage a meaningful relationship between the father and the children.

We also depart from the juvenile court's interpretation of the father's 2015 "publicly complaining" about the mother's interference. The father complained about the lack of visitation when confronted with the possibility his child-support obligation could increase. After the mother withdrew her request for adjustment of child support, the father did not "publicly complain" about lack of visitation for another fifteen months. It is true the father filed a petition seeking custody of the children in 2017, but by that time he was only known as "a family friend" to his children. The mother's response of filing a petition for termination of the father's parental rights, was a reasonable response—the father's petition sought not only visitation, but also physical custody of the children he had only seen less than ten hours in the past seven years.

The juvenile court also found *In re N.D.D.*, 434 N.W.2d 919 (Iowa Ct. App. 1988), analogous to the present case. In that case, the parents of the child were divorced in 1982 and the father was granted reasonable visitation. *N.D.D.*, 434

N.W.2d at 920. The father moved to Mississippi for work in 1983. *Id.* After he moved, the father sent the child cards and called her. *Id.* The father visited his child for one week in September 1984. *Id.* Due to a proposed pay cut, the father left his job in April 1985, and was unemployed for seven months thereafter. *Id.* The father found work in Dubuque, Iowa, in October 1985. *Id.* Between September 1984 and October 1985, the father made little or no attempt to contact his child. *Id.* The father testified he made no attempts to visit because "both his wife and his attorney told him that he should not do so because of his child support arrearages." *Id.* In October or November of 1986, after he had paid a large amount toward his child-support arrearage, the father contacted the local county attorney about possibly visiting his child and asked the county attorney to contact his wife. *Id.* After the wife received a letter from the county attorney, she filed a petition to terminate the father's parental rights. *Id.*

*N.D.D.* is not sufficiently similar to the present case to be determinative. Here, visitation was never established. In the instant case, the father has lived a mere hour away from his children since 2010, and yet has visited them less than the father did in *N.D.D.* The father in *N.D.D.* was also dissuaded from visiting his child by the mother and his attorney due to his child-support arrearages, but here the father had no such concern. The father in *N.D.D.* was also established in his child's life as the child's father at the time the termination petition was filed. Here, C.P. is the only father the children have known. The fact both mothers filed termination petitions after the fathers' respective attempts to exercise visitation does not mean the outcomes of the cases should be the same. *See In re C.L.C.*, 479 N.W.2d 340, 343 (Iowa Ct. App. 1991) (noting prior termination of parental

rights cases are of "little precedential value, and we must base our decision primarily on the particular circumstances of the parties presently before us").

On our de novo review of the record, we cannot conclude the mother prevented the father from visiting or communicating with the children when he was physically and financially able to do so. Here, the father failed to maintain regular communication and failed to visit the children on a monthly basis. The father's efforts to communicate were, at best, only marginal efforts. *See G.A.*, 826 N.W.2d at 130 (concluding a father's "sporadic text messages to the mother are insufficient to meet the regular communication requirement contemplated under section 600A.8(3)(b)(2), and were at best only marginal efforts to communicate"). We find there is clear and convincing evidence the father abandoned his children.

**B. Best Interests.**

We must still determine whether termination is in the children's best interests. *See In re H.S.*, 805 N.W.2d 737, 747 (Iowa 2011) (noting chapter 600A "has its own '[best] interests' test" found in section 600A.1). Section 600A.1 provides:

> The best interest of a child requires that each biological parent affirmatively assume the duties encompassed by the role of being a parent. In determining whether a parent has affirmatively assumed the duties of a parent, the court shall consider, but is not limited to consideration of, the fulfillment of financial obligations, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of the establishment and maintenance of a place of importance in the child's life.

The father has not assumed the duties encompassed by the role of being a parent. He has only seen the children sporadically and for short periods of time since 2010. He has not assumed any parental duties since 2010 aside from paying

minimal child support and sending some gifts.  Although he has fulfilled his court-ordered financial obligations, the father has only sometimes demonstrated interest in the children.  Even though his financial situation improved, he opposed increasing his financial support of his children.  He has not demonstrated a genuine effort to maintain communication with his children.  He apparently made no effort in 2014 to see the children, one or two efforts in 2015, and no efforts in 2016 or 2017 (until his petition was filed).  He has not demonstrated the establishment and maintenance of a place of importance in the children's lives.  We conclude it is in the children's best interests to terminate his parental rights.

**IV. Conclusion.**

We conclude there is clear and convincing evidence the father abandoned R.S. and L.S. within the meaning of Iowa Code section 600A.8(3)(b), the mother did not prevent the father from visiting or communicating with the children, and termination of the father's parental rights is in R.S. and L.S.'s best interests.  We therefore reverse the juvenile court's ruling and remand with instructions to enter an order terminating the father's parental rights.

**REVERSED AND REMANDED WITH INSTRUCTIONS.**