# IN THE COURT OF APPEALS OF IOWA

No. 20-1312
Filed January 21, 2021

**IN THE INTEREST OF D.B. and J.J.,**
**Minor Children,**

**S.B., Mother,**
        Appellant.
_____

        Appeal from the Iowa District Court for Mahaska County, Rose Anne Mefford, District Associate Judge.

        A mother appeals the termination of her parental rights to her children.
**AFFIRMED.**

        Lynnette M. Lindgren of Faulkner, Broerman & Lindgren, Oskaloosa, for appellant mother.

        Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee State.

        Rebecca L. Petig of Bierman & Petig, P.C., Grinnell, attorney and guardian ad litem for minor children.

        Considered by Doyle, P.J., Tabor, J., and Mahan, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2021).

**MAHAN, Senior Judge.**

A mother appeals the termination of her parental rights to her children, born in 2015 and 2018.[1]  She contends the State failed to prove the grounds for termination cited by the juvenile court, the department of human services failed to make reasonable efforts toward reunification, and termination was not in the children's best interests.  We affirm.

**I.      Background Facts and Proceedings**

This family came to the attention of the department of human services in March 2019,[2] when three-year-old J.J. was found wandering unsupervised several blocks from the mother's home in nearly freezing temperatures and without appropriate clothing.  Police took the child to the department's office, where the child was non-verbal and "very withdrawn."  When the mother came to retrieve J.J., she had eight-month-old D.B. with her, who appeared to have medical issues requiring further evaluation, including a flat head and visibly small stature.  The mother was "confused" and appeared to be under the influence of some substance.  She was arrested and charged with child endangerment.

The children were taken to the emergency room.  J.J. was found to have "no verbal interaction" and "unspecified lack of expected normal physiological development."  D.B. was behind on immunizations, small for his age, and had skull flattening due to prolonged supine positioning.  Examination of the children's prior

---

[1] The parental rights of D.B.'s father and J.J.'s putative fathers were also terminated, and they did not appeal.

[2] The department had previously provided voluntary services to the family in 2017, following an incident in which the mother threatened the maternal grandmother with a knife in the presence of J.J.

medical records revealed the mother had not followed through with recommended services for these issues. The children were removed from the mother's care, adjudicated in need of assistance, and placed in foster care where they have remained since.

An array of rehabilitative services were offered to the mother, including a psychological evaluation with parental assessment, mental-health treatment, supervised visitation, family team meetings, and drug testing. The mother struggled to make or attend appointments, both for herself and for the children. The court's July 2019 dispositional order found continued removal of the children from the mother's home was necessary "due to the mother's inability to safely parent the children and due to neglect of the children." Specifically, the court noted "concerns regarding the mother's health and her ability to stay awake" and the mother's "complete denial of concerns that people are witnessing regarding the children ([J.J.] being non-verbal is one example)."

In September 2019, the mother was found guilty of child endangerment. She was sentenced to two years of probation. She was subsequently arrested for violating her probation by failing to report and maintain contact with her probation officer. The mother's lack of compliance with her probation requirements mirrored her lack of compliance with the department's case plan requirements. In January 2020, her probation was revoked and she was sentenced to a prison term not to exceed two years. Thereafter, the mother had phone contact with the children, but in-person visits were delayed due to the child-endangerment charges that precipitated her incarceration. Shortly after the correctional facility approved in-person visits, the visits began taking place via videoconference due to COVID-19.

Meanwhile, the guardian ad litem reported that D.B. had "completely changed" since being in the care of the foster parents, including his physical and emotional development. The guardian ad litem also noted changes in J.J.'s development and behavior, including that she was interactive, excitable, and displayed a visible bond with the foster mother.

In April 2020, the State filed a petition to terminate the mother's parental rights. The termination hearing was held over two days in August 2020. The record before the juvenile court indicated the children had been removed from the mother's care since March 2019, the mother had been released from prison in July 2020, and visits with the children remained fully supervised. The department caseworker opined the mother had made "no progress" in the areas of parenting and her ability to provide for the children's needs. The department caseworker and guardian ad litem recommended termination of parental rights.

Following the termination hearing, the court entered its order terminating the mother's parental rights pursuant to Iowa Code section 232.116(1)(f) (2020) (concerning J.J.) and (h) (concerning D.B.). The mother appeals.

## II.  *Standard of Review*

Appellate review of termination-of-parental-rights proceedings is de novo. *In re L.T.*, 924 N.W.2d 521, 526 (Iowa 2019). Our primary consideration is the best interests of the children, *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006), the defining elements of which are the children's safety and need for a permanent home. *In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011).

### III. Discussion

The mother challenges the sufficiency of the evidence supporting the grounds for termination cited by the juvenile court. Iowa Code sections 232.116(1)(f) and (h) require proof of several elements conceded by the mother and proof the children could not be returned to her custody. The mother contends the evidence did not establish the children could not be returned to her care at the present time.

The mother was released from prison less than one month prior to the termination hearing. She testified she was living with a friend, who was getting ready to move "within the next couple of months." She had just gotten a "better job." The mother testified, "I've been trying to attend to my mental health needs, and I've been on medication." She stated she would not miss appointments because, "I realize that I have to show up early for things." The mother testified, "Last year is when everything hit me and I said, 'Oh, my gosh. I've got things to work on.'" But she stated, "I made the most out of prison," including taking classes and reading self-help books, and "I'm just hoping that everybody can see that I am really trying to change" and "I just really want to be a part of their lives, whether it's, you know, increased visits or not, but I don't think that termination of my parental rights is the right thing for us."

The department caseworker opined the mother was living in a house that "was not appropriate for the children." Indeed, the mother acknowledged her housing would not "be stable in the long-term," and she asked for additional time to "find a place of [her] own." The caseworker acknowledged that the mother "kind of acted like, you know, she had things ready to go and got the ball moving, but

we are unsure if that is ever going to happen." The caseworker did not believe the children could be returned to the mother's care because the mother was unable to give them the permanency and stability they needed: "They need someone who is able to take care of themselves in order to take care of the children, and I believe [the mother] does not have what it takes to do that." Ultimately, the juvenile court found:

> The gains Mother made in prison will hopefully continue to aid her in navigating her life better than she did before. Unfortunately Mother was not able to take advantage of the services and the extension of time offered to reunify with her children. She loves them. No one doubts it. But the fallout from the neglect they suffered while still in her care, will continue to require extensive time, energy and parental investment. Mother was never able to move beyond supervised visitations. Mother will need to invest her limited cognitive and emotional resources into managing herself; she would not be able to safely parent these children today, nor in the foreseeable future.

We concur in the court's finding that the children could not be returned to the mother's custody at the time of the termination hearing. Iowa Code sections 232.116(1)(f) and (h) were satisfied.

The mother also challenges the services provided, claiming her requests for a different family safety, risk, and permanency provider "were ignored" and the background-check process regarding her relative-placement request (which was ultimately denied) took too long. Although the mother challenged the sufficiency of her visits with the children while she was in prison, she did not raise these current claims before the juvenile court. *See In re S.J.*, No. 14-0978, 2014 WL 4231161, at *2 (Iowa Ct. App. Aug. 27, 2014) ("A challenge to the sufficiency of the State's efforts to reunite parents with their children should be raised when the services are offered."). The mother also points to her therapist's opinion that she

"was a fit parent," which she claims was "ignored by the department." Contrary to the opinion of the mother's therapist, the record shows the mother was "not . . . consistent in successfully completing parenting programs or maintaining her mental health." When the mother received an extension in September 2019, the department provided her with a written list of what she "needed to do in order to get her kids back" "so that she had a constant reminder of what needed to happen." The caseworker went through the list, and "even sat with her and [they] called to set up appointments," but

> [s]he failed to do the things that I needed her to do in the case plan, and she also wasn't able to follow through with the expectations of her probation. So you see that underlying problem is that she—she's not able to follow through with the—you know, the commitments that she has with her criminal charges or her children.

In this regard, we find the caseworker's characterization of the department's efforts as "above and beyond what [it] would normally do for . . . [a] parent" to be accurate.

Termination also must serve the children's best interests. *See* Iowa Code § 232.116(2). At the time the children were removed, J.J. did not respond to her name, grunted in response to questions, and exhibited self-harming behavior. At the time of the termination hearing, J.J. was speaking in full sentences, doing "normal" kid activities, was fully potty trained, and was "just a totally different child." And D.B. had progressed from the fourth percentile to the seventy-fifth percentile in weight, was "talking and jump[ing] around," and was "within a few months of his developmental age." The children had a "really strong" bond with their foster parents and went to them "for all of their needs." We conclude termination is in the children's best interests, and no permissive statutory exception should be applied

to preclude termination.  We affirm the decision of the juvenile court to terminate the mother's parental rights.

**AFFIRMED.**