# IN THE COURT OF APPEALS OF IOWA

No. 21-1248
Filed February 16, 2022

**IN THE INTEREST OF C.S.,**
**Minor Child,**

**E.L., Mother,**
    Appellant.

_____

Appeal from the Iowa District Court for Mitchell County, Karen Kaufman Salic, District Associate Judge.

A mother appeals the termination of her parental rights to her child. **REVERSED AND REMANDED WITH INSTRUCTIONS.**

Danielle M. Ellingson of Eggert, Erb, & Ellingson, P.L.C., Charles City, for appellant mother.

Thomas J. Miller, Attorney General and Ellen Ramsey-Kacena, Assistant Attorney General, for appellee State.

Cynthia Schuknecht, Charles City, attorney and guardian ad litem for minor child.

Considered by May, P.J., Schumacher and Badding, JJ.

**BADDING, Judge.**

Many appeals that we see in cases terminating parental rights involve young children who have not yet formed a close bond with a parent or whose parent is absent for an extended period of time. This appeal involves the converse—a seventeen-year-old child whose mother has been largely present in his life. Following termination of her parental rights under Iowa Code section 232.116(1)(f) (2021),[1] the mother appeals. In no particular order, she claims termination is contrary to the child's best interests, statutory exceptions should be applied to preclude termination, and permanency should be accomplished through either the establishment of a guardianship with the maternal grandmother or another planned permanent living arrangement.

**I.      Background Facts and Proceedings**

In April 2018, when C.S. was thirteen years old, a report was made to the Iowa Department of Human Services that his parents were using methamphetamine. There were also concerns about lack of electricity and running water in the home. The department asked the parents to provide drug screens. The father did so and tested positive for methamphetamine. The mother refused a hair-stat test, and she never returned her sweat patch for processing. She said that she would test positive for methamphetamine but explained the positive result would be due to her medication for attention deficit hyperactivity disorder. In October, because of continuing concerns about the parents' drug use, C.S. and

---

[1] The mother's petition on appeal states her rights were terminated under section 232.116(1)(e) and (f). The termination order only referenced section 232.116(1)(f) as to the mother. The father's rights were terminated under both paragraphs, and he does not appeal.

his older brother[2] were adjudicated as children in need of assistance under Iowa Code section 232.2(6)(n) (2018). They were allowed to remain in their parents' custody with placement in their mother's home under the department's supervision.

But in early November, the mother tested positive for methamphetamine. It was also discovered that a man with a long criminal history was residing in the home.[3] The children were removed from the mother's home and placed in foster care with a couple who had cared from them in the past. After the removal, the mother continued to test positive for methamphetamine. And she continued to deny drug use, blaming her positive tests on prescription medication despite evidence to the contrary. As the juvenile court noted in its March 2019 dispositional review order, "The sole bright spot is that she has attended visits regularly."

There were other bright spots as the case progressed. The mother had some negative drug screens in the months that followed and completed a psychological evaluation. Following the department's advice, she moved into her mother's home in Minnesota so that she was closer to family support. Once there, the mother completed substance-abuse treatment and obtained employment. By October, a parent Interstate Compact on the Placement of Children (ICPC) home study had begun for the home. Because the study was not completed by the time of the permanency hearing, the department recommended a six-month extension to continue reunification efforts. The juvenile court followed that recommendation.

---

[2] The brother reached the age of majority in late 2020 and is not a subject of this appeal.

[3] By then, the parents had separated, and the father had moved to Minnesota.

In early 2020, the Minnesota Department of Human Services approved the mother's home in Minnesota with the maternal grandmother for placement of the child. The home study report shows the mother significantly downplayed her history of substance abuse to the evaluator, which was noted as a concern. To alleviate the concern, the evaluator requested an immediate drug screen. The mother missed that drug screen, but she did submit to two drug screens in the following weeks, which were negative for all substances tested for.

By February 2020, the mother was exercising weekend visits with the children in Minnesota. Both children wanted to move to Minnesota with her. In its March report to the court, while acknowledging the concerns noted in the ICPC home study, the department recommended the children move to Minnesota to live with the mother under the supervision of local service providers with a review hearing to be held ninety days after the move. This time, the juvenile court did not follow the department's recommendation, highlighting the mother's "defiance and lack of honesty," her "inability to get the boys home on time from visits," her failure to engage in mental-health treatment, and C.S.'s deteriorating mental health. The court ordered removal to continue.

Come mid-March, when the COVID-19 pandemic was still in its early stages, the mother was allegedly exposed to the virus while the children were in Minnesota for a weekend visit. The foster mother was concerned about them returning to her home since she operated a daycare. So the department recommended that the children remain with the mother in Minnesota to quarantine. After the quarantine time had passed, the mother tried to keep the children with her in Minnesota. This prompted the guardian ad litem to request a court order for

immediate return of the children to Iowa, which was entered the same day. When the mother failed to comply, the juvenile court entered a pickup and transport order and scheduled a contempt hearing for the mother. She finally returned the children to their foster home on April 10.

A permanency-review hearing was held at the end of April. While the department had continuing concerns about the mother's recent behavior, the case manager verified that the mother set up services for herself and the children in Minnesota. The department's report to the court noted that "[w]hile the past 2 weeks have not been positive and been very challenging for all involved, the Department recognizes that the boys had been adjusting to the new environment and were not considered unsafe." The department again recommended that they be placed with the mother in Minnesota under strict supervision there.

Once more, the juvenile court disagreed, its dissatisfaction with the mother abundantly clear. In its order, the court stated its belief that the mother fabricated her exposure to COVID-19 to circumvent its prior order that the children remain out of her custody. The court found her in contempt and imposed a brief term of incarceration. Given its "inability to trust that Mother will act in the best interest of these children or consistently meet their needs," the court concluded they could not be returned to her. The court changed the permanency goal from reunification to another planned permanent living arrangement in foster care.[4]

---

[4] The mother filed an application for interlocutory appeal following this permanency-review order. Her application was denied by the supreme court. She also filed a petition for writ of certiorari concerning the finding of contempt, which was likewise denied.

In June, in-person visits were reinitiated, which went well. By August, the mother had continued her mental-health treatment and maintained her employment. The ICPC home study had expired, but the department recommended a second one be completed to re-explore placement of the children with the mother in Minnesota. Perhaps sensing the juvenile court was not willing to return the children to her, the mother proposed a guardianship with the maternal grandmother. The department was not opposed to this request if the home study was approved. That approval came in mid-October, with the home study noting no concerns for the children living in the home of the mother and maternal grandmother. The court, however, was concerned, stating that "it is imperative that we have negative hair-stat testing from Mother before that option could be approved."

The mother complied with the requested hair-stat test in December and was again positive for methamphetamine. She continued to deny use, blaming her medication even though that theory had been debunked by the testing lab. The department suspended all visitations that could not be supervised in Iowa. The mother then became extremely hostile with service providers, bombarding them with expletive-laced text messages. She started to resist services that had been put in place for C.S. and undermined rules the foster family had instituted for him.

The department summarized the mother's negative attitude in its March 2021 report as follows:

> When angry or frustrated, it is impossible to talk with her. She curses, uses derogatory words, rambles, and makes threats. Unfortunately, those behaviors have occurred during visits with [C.S.] present. While they are just words, they have

the power to significantly damage or destroy any relationship
that [C.S.] has with that professional.

Because of the mother's "hostile, erratic, [and] unhealthy behavior," the department suggested "that all services to [her] end. Reunification is no longer the goal." Instead, the department recommended that C.S. remain in foster care with continued services "to assist him with a successful transition to adulthood."

The juvenile court went one step further and ordered the State to start termination proceedings. While the court recognized that C.S. wanted to live with his mother, it found "there is no reason to slowly drag out the adjudicatory harm [she] imposes on him up to his 18th birthday like we did with [his older brother]."[5] The "only logical permanency goal to pursue," according to the court, was termination of parental rights.

Before filing the petition, the State filed a motion requesting guidance from the court, stating its belief that—due to the child's age, desires, and lack of adoptability—termination would be contrary to his best interests. The court directed the State to comply with its prior order. So the State filed a termination petition in June.

Before the trial on the petition, the department's case manager met with C.S. and reported his position as follows:

> [C.S.] was able to share that he feels "sad, angry and mad" when he thinks about his mom's parental rights being terminated. Through further discussion, [C.S.] was able to be specific and share that he "feels mad at Mom for not doing the right thing for him." This worker talked with [C.S.] about the negative and any positive feelings

---

[5] The court noted that after C.S.'s older brother turned eighteen, he quickly violated the conditions that would have allowed him to stay in the foster home until he graduated from high school by using drugs. He ultimately ended up with the mother in Minnesota.

he might have if his parents' rights were terminated. [C.S.] was able to recognize that he'd feel angry and very sad if he couldn't see his mom anymore, or have any contact with her at all. He shared he has an "emotional" connection with her. He shared that he likes to have contact with his mom and that he plans to have contact with her when he turns 18 years old, in just over a year's time. [C.S.] then verbalized to this worker that a "positive" to his parents' rights being terminated would be "because I wouldn't be getting the negative attitude from mom." This worker asked [C.S.] to explain that further. [C.S.] verbalized to this worker that he thinks his mom "brings out the negative parts in him." When this worker asked why he felt that way he shared, "because she says bad things about everybody; DHS workers, the judge, counselors, and my foster parents." [C.S.] shared with this worker that he "feels like he has to agree with her because he's afraid to upset her."

Continuing in this same self-aware vein, C.S. stated that while he did not want his mother's rights terminated, he did not feel safe in her care because "she jumps around all the time." He did feel safe in his foster home and wanted to remain there to finish high school. The foster parents, who have cared for the child since late 2018, were willing to allow him to do so, though they were not open to adoption or serving as the child's guardians. Given all this, the department recommended that, instead of termination, permanency for C.S. be achieved in a planned permanent living arrangement with his foster parents. The guardian ad litem concurred. The mother, who by then had moved back to Iowa but continued to test positive for methamphetamine, again requested that a guardianship be established with the maternal grandmother in Minnesota.

The juvenile court rejected all of these options in its termination ruling, in which it found sufficient evidence to terminate the mother's rights under Iowa Code section 232.116(1)(f) (2021). While it acknowledged how close C.S. was to adulthood and his desire to maintain a relationship with the mother, the court determined termination was in his best interests because of the negative impacts

of that relationship. The court declined to apply any exceptions to termination and ordered that the mother's parental rights be terminated. This appeal followed.

## II.     Analysis

The mother raises various arguments on appeal that we will address as they progressively arise through the statutory framework. That framework starts with a three-step analysis to conduct our de novo review of the termination proceedings. *See In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010). The mother does not challenge the first step of the analysis—whether the statutory ground for termination was established. *See id.* So we skip that step and consider whether the best-interest framework as laid out in section 232.116(2) supports termination. *See id.* If it does, we then consider whether an exception should be applied to overcome termination. *See id.*

### A.     Best Interests and Statutory Exceptions

Beginning with the best-interest question, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). For a child who, like C.S., has been placed in family foster care, this consideration may include "whether the child has become integrated into the foster family to the extent that the child's familial identity is with the foster family, and whether the foster family is able and willing to permanently integrate the child into the foster family." *Id.* § 232.116(2)(b). But the defining elements remain the "child's safety and his or her need for a permanent home." *In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011).

The dilemma we face is this: the mother cannot provide a safe environment for C.S. because of her drug use. For the past three years, that safe environment has been provided by C.S.'s foster family. But they are not open to adoption or guardianship. *See* Iowa Code § 232.116(2)(b). So if we affirm the termination of the mother's parental rights with no adoptive parent waiting in the wings, C.S. will become a "legal orphan." *See* Richard L. Brown, *Disinheriting the "Legal Orphan": Inheritance Rights of Children after Termination of Parental Rights*, 70 Mo. L. Rev. 125, 126 (2005) (defining "legal orphan" as a child who has lost his or her parents "through a termination of parental rights proceeding but who has not been subsequently adopted by new parents").

This *possibility* has been countenanced in past cases. *See, e.g., In re S.O.*, 483 N.W.2d 602, 604 (Iowa 1992) (stating the "difficulty in finding an adoptive home for children with serious emotional problems" is not "a sufficient reason for refusal to terminate"), *superseded by statute as recognized in In re L.T.*, 924 N.W.2d 521 (Iowa 2019) (noting "before 1997, Iowa's child welfare laws focused on reuniting the family unit" but have since "shifted from reunification of the family to the child's best interests"); *see also In re T.M.*, No. 02-1715, 2002 WL 31758366, at *1 (Iowa Ct. App. Dec. 11, 2002); *In re D.P.*, 465 N.W.2d 313, 315 (Iowa Ct. App. 1990). But here it would be a reality. We do not believe that's in C.S.'s best interest considering his age, wishes, familial identity, and bond with his mother. *See, e.g., In re E.B.*, No. 15-1384, 2015 WL 5970443, at *6 (Iowa Ct. App. Oct. 14, 2015) (affirming permanency order that changed goal to another planned permanent living arrangement considering the children's ages, familial identity, and continued bond with their mother and each other); *In re T.S.*, No. 11-1406,

2012 WL 162923, at *2 (Iowa Ct. App. Jan. 19, 2012) (affirming another planned permanent living arrangement in lieu of termination because of barriers to adoption, "as well as the ongoing bond and relationship" between the child and her father); *In re B.M.*, No. 10-1762, 2011 WL 441829, at 3 (Iowa Ct. App. Feb. 9, 2011) (finding termination was not in children's best interests given their "ages and desires").

C.S. is less than one year away from his eighteenth birthday. He has expressed a clear desire to maintain a relationship with his mother, both now and after he turns eighteen. Terminating the mother's rights at the eleventh hour of this child's minority would do little to serve his best interests. All the professionals involved in the case agree that C.S. and his mother share a strong bond. C.S. also wanted to continue a relationship with his siblings and extended family. While a psychological evaluation found that C.S. has borderline intellectual functioning, he was mature enough to recognize that certain aspects of his relationship with his mother were not healthy and that he would not be safe in her home. His plan, as expressed to the department's case manager, was to remain in his foster home, "graduate high school and then go to culinary school." Because of C.S.'s age and goal to continue his relationship with his mother, the department felt that "services should continue to assist with guiding [C.S.] in having such a relationship in a safe and appropriate manner" while he continues in therapy.

Allowing C.S.'s relationship with his mother to continue with the guidance of the department will better serve C.S.'s physical, mental, and emotional needs than leaving him in a parentless void. We have recognized that children share their "parents' fundamental interests in familial association." *In re S.O.*, 967

N.W.2d 198, 206 (Iowa Ct. App. 2021).  Studies have shown that even where parents are inadequate or neglectful, children's

> relationships with their biological parents (and other relatives) remain important to children in foster care.  Especially for children whose parents' parental rights have been terminated, the connection with their biological parent remains central to their development and these children make efforts to maintain that connection.

Lashanda Taylor, *Resurrecting Parents of Legal Orphans: Un-Terminating Parental Rights*, 17 Va. J. Soc. Pol'y & L. 318, 320–21 (2010); *accord* Marsha Garrison, *Why Terminate Parental Rights?*, 35 Stan. L. Rev. 423, 461–66 (1983) (discussing studies that together showed "continued parental visitation benefits children in long term foster care").  Terminating the mother's parental rights will not erase her from C.S.'s mind and, in fact, may have the opposite effect.  *See* Garrison, 35 Stan. L. Rev. at 465 ("Without parental contact, the child will tend to base his impressions of the lost parent solely on fantasy; some children may therefore idealize their absent parents and dream about a future reunion," which "can impede the child's ability to form realistic current relationships").

And because C.S. will remain in foster care until he ages out, his "stability and long-term interests will not be affected if the mother's rights are *not* terminated."  *In re B.T.*, 894 N.W.2d 29, 34 (Iowa Ct. App. 2017) (finding termination was not in a ten-year-old child's best interest because a guardianship with his grandmother would allow the child to maintain a relationship with his mother).  Indeed, C.S. may feel more stable if he retains that connection with his mother in the safety net of the department.  We recognize the effect the mother's negative behavior had on the professionals involved in this case and, at times, on

C.S.[6]  But our statute allows restrictions to be placed on her contact with C.S.  *See* Iowa Code § 232.104(5) ("Any permanency order may provide restrictions upon the contact between the child and the child's parent or parents, consistent with the best interests of the child."); *see also In re M.M.M.*, No. 06-1768, 2007 WL 253987, at *5 (Iowa Ct. App. Jan. 21, 2007) (finding entry of a permanency order under section 232.104(2) outlining a court-ordered visitation schedule served children's best interests better than termination when children were over ten years old and objected to termination).

Although we have found termination to be contrary to the child's best interests, we choose to touch on the mother's arguments relating to the exceptions to termination.  *Cf. B.T.*, 894 N.W.2d at 34 (finding two exceptions under section 232.116(3) applied to negate the need for termination after also finding termination was not in the child's best interests); *M.M.M.*, 2007 WL 253987, at *4 ("We will address this issue, even though we have concluded the absence of reasonable efforts mandates reversal.").  She argues two exceptions should be applied—Iowa Code section 232.116(3)(b) and (c), which respectively authorize the court to avoid termination when "[t]he child is over ten years of age and objects to termination" or "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship."  For the same reasons discussed above, we agree the mother met her burden to allow

---

[6] That said, we note that C.S.'s psychological evaluation linked his increased "acting out behaviors" to his brother moving out of the foster home.  Those behaviors included stealing money from a local laundromat.

the juvenile court to apply these permissive exceptions to termination. We now turn to the question of what happens next for C.S.

### B. Disposition

When termination is denied but a child remains in need of assistance, the juvenile court may enter a permanency order under section 232.104 which, as the mother suggests, can involve transfer of "guardianship and custody of the child to a suitable person" or the ordering of "another planned permanent living arrangement for the child." *See* Iowa Code § 232.117(2), (3), (5); *see also id.* § 232.104(2)(d)(1), (4); *see generally id.* § 232.104(4)(a) ("Prior to entering a permanency order pursuant to subsection 2, paragraph "d", convincing evidence must exist showing that . . . [a] termination of the parent-child relationship would not be in the best interest of the child."). The mother requests one of the two following permanency options: establishment of a guardianship with the maternal grandmother under section 232.104(2)(d)(1) or another planned permanent living arrangement under section 232.104(2)(d)(4).

As to her request for a guardianship, the mother generally asserts the grandmother can provide appropriate care, and the child objected to termination. Although section 232.104(2)(d)(1) allows for the establishment of a guardianship, if another planned permanent living arrangement is also in play, section 232.104(3) requires the court to "[a]sk the child about the child's desired permanency outcome and make a judicial determination that [the] arrangement is the best permanency plan for the child." *See B.T.*, 894 N.W.2d at 32–33. Determining the best permanency plan for a child is a best-interests assessment. *See In re J.W.*, No. 19-0372, 2019 WL 1950009, at * 5 (Iowa Ct. App. May 1, 2019).

C.S. has thrived in his foster placement—where he feels safe and comfortable—and he desires to remain with his foster family in the community that is known to him and complete his formative education. At the time of trial, he was seventeen years old and a junior in high school. He has established relationships with counselors and teachers, with services in place to help him succeed in school and life. To rip him away from this safe and comfortable setting when he is close to completing high school only to ship him off to Minnesota to start anew for a short time would certainly not be in this child's best interests. As a result, we cannot conclude a guardianship with the maternal grandmother in Minnesota would be the best permanency plan for C.S.

On the other hand, because C.S. is "sixteen years of age or older," we have the option to "order another planned permanent living arrangement for the child." *See* Iowa Code § 232.104(2)(d)(4). The professionals in the case advocated for an arrangement that would allow C.S. to stay in his foster placement until he comes of age while continuing to receive services, including visitation with the mother. This is in line with the child's wishes and, to some extent, the mother's so long as it avoids termination. And for the reasons already stated, there are compelling reasons the other permanency options in section 232.104(2)(d)(1)–(3) cannot be employed. *See Id.* On our de novo review, we find the arrangement described above to be the best permanency plan for the child. *See id.* § 232.104(3)(a).[7]

As a result, we reverse the termination of the mother's parental rights as contrary to the child's best interests. We remand for dismissal of the petition as it

---

[7] We also conclude clear and convincing evidence satisfies the requirements of Iowa Code section 232.104(4).

relates to the mother and entry of a permanency order allowing the child to remain in the custody of the department for continued placement in foster care with continued services and visitation. The frequency, duration, and level of supervision of visits between the mother and child shall be subject to the terms and oversight of the juvenile court. *See M.M.M.*, 2007 WL 253987, at *5; *In re B.M.*, 532 N.W.2d 504, 507 (Iowa Ct. App. 1995).

## III. Conclusion

We reverse the decision of the juvenile court terminating the mother's parental rights and remand for dismissal of the petition and the entry of a permanency order consistent with this opinion.

**REVERSED AND REMANDED WITH INSTRUCTIONS.**