**IN THE COURT OF APPEALS OF IOWA**

No. 23-1882
Filed January 24, 2024

**IN THE INTEREST OF I.C.,**
**Minor Child,**

**J.C., Father,**
        Appellant,

**D.B., Mother,**
        Appellant.
_____

        Appeal from the Iowa District Court for O'Brien County, Jessica Noll, District

Associate Judge.


        Parents separately appeal the termination of their parental rights.

**AFFIRMED ON BOTH APPEALS.**


        Alexandria Celli Smith of Sandy Law Firm, Spirit Lake, for appellant father.

        Kevin J. Huyser of Rensink, Pluim, Vogel & Huyser, Orange City, for

appellant mother.

        Brenna Bird, Attorney General, and William E. Sales III, Assistant Attorney

General, for appellee State.

        Tisha M. Halverson of Klay, Veldhuizen, Bindner, De Jong & Halverson,

P.L.C., Paullina, attorney and guardian ad litem for minor child.


        Considered by Tabor, P.J., and Badding and Chicchelly, JJ.

**BADDING, Judge.**

After more than two years of services aimed at reunification, the juvenile court terminated the parental rights of a mother and father to their child, born in 2015, under Iowa Code section 232.116(1)(f) (2023). In their separate appeals, both parents challenge the sufficiency of evidence supporting that ground, argue termination is contrary to the child's best interests, and ask for application of the permissive exception to termination in section 232.116(3)(c). We affirm.

## I.    Background Facts and Proceedings

In September 2021, the Iowa Department of Health and Human Services received a report that the child's mother was using marijuana while caring for him and had threatened to kill herself, the child, and his father. When a child protective worker went to the home to investigate, the parents refused to cooperate, so law enforcement was summoned to help. Once the father brought the child outside, the worker noted "a strong odor of marijuana." The child later tested positive for THC metabolites. He was also developmentally behind because he had not yet attended any schooling even though he was six years old.

The State obtained an order for temporary removal and filed a child-in-need-of-assistance petition. Shortly after removal, law enforcement returned to the home because the mother assaulted the father. Officers found drugs and paraphernalia in the home. They also noted that it was filled with trash.[1] The mother was arrested for domestic abuse assault causing bodily injury or mental

---

[1] Similar concerns led to intervention from child-welfare authorities in Minnesota when the child was just two months old. The family received services in Minnesota from then until March 2021, when they moved to Iowa.

illness and possession of drug paraphernalia, while the father was arrested on charges of possession of marijuana and drug paraphernalia.

The parents had inconsistent contact with the child through the dispositional hearing in November. This was not new for the mother who, according to a paternal aunt, had been "popping in and out of" the child's life for years. The father missed his appointment for a substance-abuse evaluation and took no steps to reschedule it. The mother completed hers while she was in jail, but she did not follow through with treatment once she was released, though she did find a job.

By February 2022, the father had completed a substance-abuse evaluation. But he did not consistently attend his treatment sessions. And less than a week after his evaluation, he was arrested for possession of marijuana again, this time with his new girlfriend. The mother maintained her employment and found a place to live after being homeless for a time. Yet she continued to use marijuana and was not engaged in substance-abuse treatment. While she also avoided recommended therapy for her multiple mental-health diagnoses, she did attend appointments with her medication provider.

At the review hearing in May, the juvenile court warned the parents "about the upcoming permanency hearing and that their full participation and cooperation in court ordered services, including substance abuse treatment, was of the utmost importance." Unfortunately, the parents did not take the court's warning to heart. By the permanency hearing in October, the father had lost his job and was unsuccessfully discharged from substance-abuse treatment—though he had negative drug screens since August. While the mother maintained housing, she lost her employment, continued to use marijuana, and did not participate in

substance-abuse or mental-health treatment. Given the parents' lack of progress, the department at first recommended that the case proceed to termination. But at the permanency hearing, the parties stipulated to a deferral of permanency for six months. The parents did not, however, use those six months to their advantage.

The mother's marijuana use persisted, and her visits continued to be fully supervised. The father, on the other hand, was testing negative for drugs, although he was not participating in substance-abuse treatment. He progressed to semi-supervised visits, then unsupervised visits, then overnights. Come May 2023, the department started a trial home placement with the father. Custody was returned to the father in mid-May, subject to department supervision. But that was short-lived. Just ten days after the court entered its June permanency-review order memorializing the return of custody, the department sought removal because of concerns about the child's attendance at school and therapy; some of the child's behaviors, including homicidal thoughts; and the department's discovery that the father and his girlfriend had been manipulating their drug tests.

The father underwent another substance-abuse evaluation following removal. The drug test he was given during that evaluation was positive for THC metabolites. Not surprisingly, the father didn't follow through with recommended treatment. He also stopped attending visits with the child and communicating with service providers. For her part, while the mother did begin participating in some services, she agreed her living environment was not safe for the child because her roommate was using methamphetamine.

In August, the State petitioned to terminate the parents' rights because of their lack of progress toward reunification. A termination hearing was held later

that month. By then, the mother had obtained new housing and employment. And she was finally participating in mental-health therapy that had been recommended since the case began. Yet the department caseworker did not believe the child could safely be returned to the mother's custody, testifying that while "it's great that she's doing it now," there had been

> several times in the case where she had done the evaluation, done therapy, but then had dropped off for certain reasons. She would even stop communicating with me. Those were the times that I knew she was probably struggling with her mental health and her own personal situations, so there hasn't been a consistent longevity throughout the case to show that she has done all the services consistently.

As for the father, who had not seen the child since June, the worker testified the child could not be returned to his custody because of the problems during the recent return and his failure to participate in substance-abuse treatment.

In the end, the juvenile court terminated both parents' rights under Iowa Code section 232.116(1)(f). The mother and father separately appeal.

## II.    Analysis

We apply a three-step analysis on our de novo review of the juvenile court's decision to terminate parental rights, asking whether (1) a statutory ground for termination is satisfied, (2) the child's best interests are served by termination, and (3) a statutory exception applies and should be exercised to preclude termination. *See In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022); *see also* Iowa Code § 232.116(1)–(3). The parents challenge each of these three steps.

### A.    Ground for Termination

Both parents claim the State failed to prove the final element of Iowa Code section 232.116(1)(f)—that the child could not be returned to their custody at the

time of the termination hearing.[2]  *See* Iowa Code § 232.116(1)(f)(4); *In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010) (interpreting the statutory language "at the present time" to mean "at the time of the termination hearing").

In arguing that the court "erroneously determined that [the child] could not be returned to" her custody, the mother focuses on the progress she made in the final months of the case—her housing, job, and participation in substance-abuse and mental-health treatment.  Like the juvenile court, we applaud the mother for that progress.  But given her past performance, it was "too little, too late."  *In re B.T.*, No. 22-0156, 2022 WL 1100923, at *1 (Iowa Ct. App. Apr. 13, 2022) (noting we have often relied on this maxim in affirming terminations of parental rights); *accord In re C.B.*, 611 N.W.2d 489, 495 (Iowa 2000) (holding a parent's efforts "in the two or three months before the termination hearing, in light of the preceding eighteen months," were insufficient); *In re A.E.*, No. 16-0510, 2016 WL 32371887, at *3 (Iowa Ct. App. June 15, 2016) (collecting cases noting last-minute efforts are not reliable).

In a September 2021 mental-health evaluation, the mother reported having "mental health issues since the age of 10 years old" and struggling with substance abuse for almost as long.  The evaluator noted, "Substances were always around in her life.  From 13-18 has been into many drugs.  Cannabis is the only substance used in the past three years. . . .  Was in treatment 7 to 8 times."  Yet the mother did not begin participating in therapy or substance abuse treatment until May 2023,

---

[2] *See In re B.W.*, No. 23-0518, 2023 WL 4759462, at *3 n.5 (Iowa Ct. App. July 26, 2023) (discussing the two different interpretations in our case law for finding that children "cannot be returned" to parental custody as provided in section 232.102). Our conclusion is the same under either interpretation.

more than a year and a half after the child was removed from her care. Her marijuana use persisted throughout the case, even up to the termination hearing. As the department's termination report stated: "The concern remains that [the mother] has had periods of consistency throughout the life of the case and then back slides and doesn't follow through with the recommendations and has to start over. . . ." With this history, we agree with the juvenile court that the child could not be returned to the mother's custody. *See In re N.F.*, 579 N.W.2d 338, 341 (Iowa Ct. App. 1998) ("[A] good prediction of the future conduct of a parent is to look at the past conduct.").

Turning to the father, he claims the "fact the minor was returned to [his] care just a few months prior to the [termination] hearing indicates the progress made by the father throughout this case." The record shows the opposite. When the child was in his custody in May and June 2023, the father did not ensure that the child regularly attended school or therapy, disrupting the progress the child had made up to then. The child missed at least one day of school each week when he was with the father. And this was a child who, at the start of the case, could not count past two, recite the alphabet, or recognize colors at age six. The father also laughed off concerns about the child's mental health when told the child was "drawing pictures with knives and blood" and making homicidal statements. On top of this, the father never consistently participated in recommended substance-abuse treatment and falsified his drug tests for the department. Once the child was removed from his custody at the end of June, the father stopped services altogether, including visits with the child. Although the father describes these circumstances as a "hiccup," they amount to clear and convincing evidence that

the child could not have been returned to his custody at the time of the termination hearing.

For these reasons, we conclude the State met its burden for termination of both parents' rights under section 232.116(1)(f).

## B.     Best Interests

Moving on to the child's best interests, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child."   Iowa Code § 232.116(2).   The defining elements of a child's best interests are safety and the need for a permanent home.  *In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011).

The mother argues she "has demonstrated that when she has the needed supports in place, as she does, she is the best placement for the long-term nurturing and growth of the child."  She points to her efforts in attending therapy with the child when he "was in a dark place following his return to his father's care" and the care she provides the child during their visits.  Without downplaying those positives, we agree with the department caseworker, who testified that the child

> needs permanency established, needs to know what his forever placement is going to be, and he needs to have that.  We've given the parents the additional six months.  We've given them time, and it's only been the last few months that [the mother] has really put forth the effort to show that she is going to do this, and I hope she continues with those, but, again, [the child] needs to have permanency.

The father's best-interest argument fails for the same reason—"It is simply not in the best interests of children to continue to keep them in temporary foster homes while the natural parents get their lives together."  *In re C.K.*, 558 N.W.2d

170, 175 (Iowa 1997). This is true even though a permanency plan has not been solidified for the child. His current foster parents, with whom he feels safe and secure, are considering adoption, as is a paternal aunt in Minnesota who passed a home study.[3] Whatever the future holds for this child, "it will be better than the 'parentless limbo'" he has been in since removal, bouncing from his first foster care placement, to a different foster home, to his father's custody, and back to the second foster home. *See In re N.B.*, No. 22-1684, 2023 WL 2148780, at *3 (Iowa Ct. App. Feb. 22, 2023) (citation omitted). Looking at both the child's immediate and long-term interests, we conclude termination of the parents' rights is in his best interests.

### C.    Statutory Exception

Both parents claim the juvenile court should not have terminated their parental rights because of their close bond with the child. *See* Iowa Code § 232.116(3)(c) (authorizing the court to forgo termination when it "would be detrimental to the child . . . due to the closeness of the parent-child relationship"). The application of a statutory exception to termination, if one exists, is "permissive, not mandatory." *In re M.W.*, 876 N.W.2d 212, 225 (Iowa 2016) (citation omitted).

---

[3] In passing, the father argues the child should have been placed with an unspecified "family member for the purposes of guardianship." Setting aside the father's failure to provide any authority or additional argument in support of this assertion, we agree with the department caseworker that due to the child's age, a guardianship was not in the child's best interests. *See In re A.S.*, 906 N.W.2d 467, 477 (Iowa 2018) ("[A] guardianship is not a legally preferable alternative to termination." (citation omitted)); *accord In re K.C.-P.*, No. 23-0886, 2023 WL 4752172, at *3 (Iowa Ct. App. July 26, 2023) (considering the "young age of the children and the lack of permanency involved in the very nature of a guardianship" in finding termination was the appropriate permanency option).

And "the parent resisting termination bears the burden to establish an exception." *A.S.*, 906 N.W.2d at 476. The parents did not meet their burden here.

Neither offered any evidence to show termination would be detrimental to the child, who was mostly unaffected when they missed visits with him. The mother argues the family-centered-services provider testified that she had a "strong and close relationship" with the child. But the provider clarified their "bond is being worked on," with the child still needing to trust the mother would "be consistent and be there." And while the child wrote that he wanted to live with the mother, his attorney and guardian ad litem stated he was not old or mature enough to make that decision. Though the child clearly loves his parents, and they love him, "love is not enough to trigger this exception." *In re A.M.*, No. 20-0480, 2020 WL 4814170, at *4 (Iowa Ct. App. Aug. 19, 2020); *accord D.W.*, 791 N.W.2d at 709 (noting that when assessing the exception in section 232.116(3)(c), the consideration is not the parent's love for the child, but whether the child will be disadvantaged by termination). We conclude any disadvantage from termination does not overcome the child's need for stability and permanency.

**AFFIRMED ON BOTH APPEALS.**